NATIONAL TREASURY EMPLOYEES' UNION, et al., Appellants,

v.

Alan K. CAMPBELL, in his official capacity as Director of the Office of Personnel Management.

No. 80–1118.

United States Court of Appeals, District of Columbia Circuit.

Argued March 2, 1981.

Decided June 5, 1981.

786

Robert M. Tobias, Gen. Counsel, Washington, D. C., National Treasury Employees' Union with whom William E. Persina, Associate Gen. Counsel, Washington, D. C., National Treasury Employees' Union was on the brief for appellants.

Before MacKINNON and WALD, Circuit Judges and AUBREY ROBINSON *, United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge MacKINNON.

Opinion filed by Circuit Judge WALD, concurring in the result.

MacKINNON, Circuit Judge:

Three plaintiffs—the National Treasury Employees' Union ("the Union"), Edward R. DeVaughn, a federal employee and Union member, and William Carney, a United States Congressman—sought equitable relief against Alan K. Campbell, then Director of the Office of Personnel Management (OPM), for his allegedly unlawful lobbying in support of the proposed Federal Employees Compensation Reform Act of 1979 ("the Compensation Act").[1] The district court granted Campbell's motion for summary judgment. *National Treasury*

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

[1]. The proposed act, in the form of bills H.R. 4477 and S.1340, was introduced into both

*Employees' Union v. Campbell*, 482 F.Supp. 1122 (D.D.C.1980). We affirm.

Plaintiffs challenged Campbell's expenditure of congressionally appropriated money to prepare and mail informational material to several newspapers and periodicals. In the mailing was a letter, dated June 1, 1979, which presented Campbell's favorable view of the proposed Compensation Act. He explained it would make "some major changes in the Federal Compensation system." (Joint Appendix (App.) at 13.) Specifically, the Act would "improve the comparability system for determining Federal pay" by, *inter alia*, comparing federal government and private sector compensation on the basis of total benefits (including fringe benefits) rather than focusing on pay alone. After informing the reader of other provisions in the proposed act, the letter concluded:

I hope that you will find it possible to editorially support the changes we are advocating. The legislation not only would allow us to implement a fair and equitable pay system, it would provide annual savings of more than $3.2 billion after full implementation.

If we can provide you with more information, please feel free to get in touch with me directly or with Bob Woodrum, our Director of Public Affairs at (202) 632–4588.

(*Id.*)

The Union, representing about 100,000 federal employees, lobbied against the legislation in the belief it would adversely affect federal employees and the Union's members in particular. After learning of Campbell's letter, the Union, joined by DeVaughn and Congressman Carney, sued Campbell in his official capacity to have him enjoined from taking any action,

such as the one complained of herein, which publicizes, propagandizes or otherwise attempts to influence any legislation

houses of Congress on June 14, 1979 and expired in subcommittee when the 96th Congress adjourned in December 1980.

that has been or will be introduced to the U.S. Congress by means of funds appropriated for [Office of Personnel Management] use.

App. at 10. Plaintiffs also asked that Campbell be ordered

to pay to the U.S. Treasury from his own personal assets an amount of money equal to those funds expended by him or his designees on the preparation and/or delivery of the letter and attachments including his salary and the salary of employees working under his discretion and [the cost] of materials....

(*Id.*) Plaintiffs also sought declaratory relief.

Plaintiffs relied on two "anti-lobbying" statutes. The first, section 607(a) of the Treasury, Postal Service and General Government Appropriations Act of 1979, Pub.L.No.95–429, 92 Stat. 1001, provides:

No part of any appropriation contained in this or any other Act, or of the funds available for expenditure by any corporation or agency, shall be used for publicity or propaganda purposes designated to support or defeat legislation pending before Congress.

The second statute is 18 U.S.C. § 1913:

No part of the money appropriated by any enactment of Congress shall, in the absence of express authorization by Congress, be used directly or indirectly to pay for any personal service, advertisement, telegram, telephone, letter, printed or written matter, or other device, intended or designed to influence in any manner a Member of Congress, to favor or oppose, by vote or otherwise, any legislation or appropriation by Congress, whether before or after the introduction of any bill or resolution proposing such legislation or appropriation; but this shall not prevent officers or employees of the United States or of its departments or agencies

from communicating to Members of Congress on the request of any Member or to Congress, through the proper official channels, requests for legislation or appropriations which they deem necessary for the efficient conduct of the public business.

Whoever, being an officer or employee of the United States or of any department or agency thereof, violates or attempts to violate this section, shall be fined not more than $500 or imprisoned not more than one year, or both; and after notice and hearing by the superior officer vested with the power of removing him, shall be removed from office or employment.

The district court held the Union lacked standing because it had failed to show how Campbell's actions had adversely affected it in fact, or had invaded any legally cognizable interest. The court also concluded that neither of the two anti-lobbying statutes created a private right of action.[2]

## I. MOOTNESS

Two developments during the pendency of this appeal have suggested to Campbell that the appeal is now moot. The first was Campbell's resignation as Director of OPM on December 1, 1980. Campbell argues his resignation has voided any justiciable controversy between the parties because he is no longer in a position to direct the use of OPM money. Plaintiffs respond that Campbell's resignation is immaterial because Fed.R.Civ.P. 25(d)(1) provides that "[w]hen a public officer is a party to an action in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and his successor is automatically substituted as a party."[3] This argument confuses mootness with abatement. We have held that

---

**2.** The court's discussion of standing was explicitly addressed only to the claim of the Union. See 482 F.Supp. at 1124. The court's conclusion as to the availability of a private remedy can be read more broadly, however, to encompass the claims of all three plaintiffs. *See id.* at 1125. The claims of all three plaintiffs were

dismissed and all three took an appeal. Each is represented by the Union's counsel.

**3.** See also Fed.R.App.P. 43(c)(1), which contains a successor substitution clause directed more specifically at events pending appeal.

the automatic substitution of an original party's successor "will not keep alive an otherwise moot controversy." *Network Project v. Corporation of Public Broadcasting*, 561 F.2d 963, 966 (D.C.Cir.1977). Our opinion in *Network*, applying *Spomer v. Littleton*, 414 U.S. 514, 94 S.Ct. 685, 38 L.Ed.2d 694 (1974), explained that where the conduct challenged is personal to the original named defendant, even though he was sued in his official capacity, a request for prospective injunctive relief is mooted when the defendant resigns.

■ Plaintiffs have not stated any desire to amend their complaint to include a claim for prospective relief against Campbell's successor, and the complaint contains no factual allegation to support such a claim. We note in any event that a determination of mootness as to injunctive relief could rest on a second development—the adjournment of the 96th Congress on December 16, 1980. With adjournment the Compensation Act bills expired short of passage. See note 1 *supra*. While plaintiffs are correct in asserting that "voluntary cessation of allegedly illegal conduct does not ... make the case moot," *United States v. W. T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1935), this is not a case where a defendant abandoned his practice in anticipation of judicial review and now "is free to return to his old ways." *Id.* Adjournment of Congress has destroyed the raison d'etre of the challenged conduct, and thus the basis for plaintiffs' claim for prospective relief. As against any current official of OPM, then, the appeal is dismissed for mootness.

■ Remaining in the case, however, is a request that Campbell be ordered personally to reimburse the fisc for money he ordered spent in allegedly unlawful lobbying. Although this claim might be nonjusticiable for other reasons, it has not lost controversial flavor through the passage of time. We thus conclude that the appeal from the denial of the reimbursement claim is not moot. *Cf. Powell v. McCormack*, 395 U.S. 486, 500, 89 S.Ct. 1944, 1952, 23 L.Ed.2d 491 (1969).

## II. STANDING

■ Campbell contends that plaintiffs present no justiciable claim at all for the reason that they lack standing. To achieve standing to sue, plaintiffs must be able to allege that Campbell's lobbying caused them "injury in fact" to an interest "arguably within the zone of interests to be protected ... by the statute ... in question." *Association of Data Processing Services Organization Inc. v. Camp*, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). The injury in fact must be personal, direct and concrete, not abstract, remote or speculative. *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975); *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). Further, the injury must be one that fairly can be traced to Campbell's action, and not one that results from the independent action of some third party not before the court. *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed. 595 (1978); *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1925–1926, 48 L.Ed.2d 450 (1976).

The plaintiffs make these allegations of injury in their complaint:

[Campbell's] publicizing, propagandizing, etc. ... causes harm to Plaintiffs, in that such activities:

(a) tend to promote passage in the U.S. Congress of a piece of legislation that is detrimental to the interests of federal employees, in that it will serve to lower the wage and/or salary level of all federal employees such as Plaintiff DeVaughn, a significant number of which employees are represented by Plaintiff NTEU;

(b) unfairly and improperly compete, to the detriment of Plaintiffs NTEU and DeVaughn, with the lobbying efforts of NTEU against passage of the above-referenced pay reform bill; and

(c) subject Plaintiff Carney to improper and unlawful lobbying activities by Defendant in connection with a bill

presently pending before Congress, in that Plaintiff Carney is and will be presented with a distorted view of public opinion due to the unlawful activities engaged in by Defendant, *inter alia.*

(App. at 9.) The district court found no injury of a legally cognizable nature or . . . any adverse developments [occurring] with respect to the Compensation Act that are causally related to the defendant's conduct. Even if [the Union] could demonstrate that Campbell's conduct had directly influenced newspaper editors in their position regarding the Compensation Act, it would still have to show some harm resulting from the adoption of those positions. This it has not done. [482 F.Supp. at 1124.]

█ We agree with the district court that the link between the challenged conduct and the passage of the Compensation Act, as asserted in paragraph (a) above, is too speculative to confer standing. Plaintiffs' other allegations of standing, however (see (b) and (c) *supra*), are not so easily dismissed. Each of these allegations rests on the view that the plaintiffs have a statutory right to be free of the lobbying of which Campbell is accused. The Supreme Court has noted that "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *S. v. D.,* 410 U.S. 614, 617 n.3, 93 S.Ct. 1146, 1148 n.3, 35 L.Ed.2d 536 (1973). One commentator has elaborated this thought:

[I]nsofar as it demands an assertion of *injury in fact* to the litigant, the doctrine of standing is generally regarded as constitutionally mandated by the "cases and controversies" limitation of article III . . . . [But] any article III-based requirement of factual or concrete injury serves only to limit the ability of federal courts to confer standing in the absence of statute; article III has not been treated as limiting congressional power to define categories of individuals or groups as parties sufficiently aggrieved by particular

governmental actions to warrant federal judicial intervention at their behest. *In effect, someone is "injured in fact" by an action for purposes of article III if the person has a statutory right to complain of the action in a federal court . . . .*

L. Tribe, Constitutional Law § 3–18 at 80 (1978) (emphasis added). The injury-in-fact component of plaintiffs' assertion of standing, then (and also the zone-of-interests component), may depend in significant part on their "statutory right to complain." We therefore pretermit any further independent analysis of standing and discuss whether they have such a right here.

## III. IMPLIED CAUSE OF ACTION

█ Although neither section 1913 of 18 U.S.C. nor section 607(a) of Public Law No. 95–429 provides in terms for a private remedy, plaintiffs would have us infer one. In determining whether a statute implies a private remedy, the several relevant factors to consider include (1) whether the plaintiffs are within the class for whose *especial* benefit the statute was enacted, (2) whether there is evidence of explicit or implicit legislative intent to create or deny a private remedy, and (3) whether a private remedy is consistent with or necessary to the purposes underlying the statutory scheme. *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975). Examining each statute in light of these factors, we conclude that neither provides a private right of action.

### A. 18 U.S.C. § 1913

Section 1913 proscribes, subject to certain limitations, the use of congressional appropriations "designed to influence in any manner a Member of Congress, to favor or oppose, by vote or otherwise, any legislation or appropriation by Congress."[4] Violators are subject to fine, imprisonment, and removal from governmental employment. Judge Flannery, applying the analysis supplied in *Cort v. Ash* and refined in several subsequent decisions of the Supreme Court,

---

**4.** The full text of section 1913 is in text preceding note 1 *supra.*

held that no "private right of action exists under section 1913." 482 F.Supp. at 1125.[5]

■ We agree. The language and structure of section 1913 indicate that no private remedy was contemplated, and the legislative history provides no persuasive indications to the contrary. Turning first to the face of the statute, and considering whether it protects a special class, we note its emphasis on the violator's conduct rather than the victim's injury: "No part of the money appropriated ... shall ... be used ...." Under the analysis supplied in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), we conclude that this language evinces no intent to benefit a special class. In *Cannon*, the Supreme Court inferred a private remedy from language reading: "No person ... shall, on the basis of sex, ... be subjected to discrimination under any education program or activity receiving Federal financial assistance." See *id.* at 681–82, 99 S.Ct. at 1949–50 (language of Title IX of the Education Amendments of 1972). The Court in *Cannon* noted the sharp contrast between the language of Title IX—expressly identifying a special class to be protected—and the

> statutory language customarily found in criminal statutes ... and other laws enacted for the protection of the general public. *There would be far less reason to infer a private remedy in favor of individual persons if Congress*, instead of drafting Title IX with an unmistakable focus on the benefited class, *had written it simply as a ban on discriminatory conduct* by recipients of federal funds or as a prohibition against the disbursement of public funds to educational institutions engaged in discriminatory practices.

*Id.* at 690–93, 99 S.Ct. at 1954–56 (footnotes omitted) (emphasis added). The language of section 1913 is that "found in criminal statutes," of which it is an example; in simply banning defined conduct it places no "unmistakable focus" on any class apart from that of the general public.[6]

The Union and DeVaughn, conceding that the language of section 1913 does not single them out as members of a special

---

**5.** In ruling there was no private right of action the district court expressly overruled its prior holding in *National Ass'n for Community Development v. Hodgson*, 356 F.Supp. 1399 (D.D.C.1973), which was decided before *Cort v. Ash*, *supra*. In the interim Judge Robinson of the district court had also ruled section 1913 created no private right of action. *American Conservative Union v. Carter*, No. 79–2495, slip op. at 4–5 (D.D.C. December 14, 1979).

**6.** Plaintiffs, acknowledging that section 1913 does not expressly confer benefits on a special class, nevertheless argue that prohibitory statutes such as section 1913 and section 607(a) should be read to imply limited equitable relief even if they do not imply a monetary remedy.

The Supreme Court cases do not support this view. In *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980), for example, the Supreme Court denied a private injunction remedy to enforce a statute that "merely 'proscribes certain conduct.'" *Id.* at 148, 100 S.Ct. at 967. The court also relied on the statute's express provision of other remedies, and drew therefrom an inference that no private remedy was intended, an inference the legislative history did not rebut. *Id.* at 149, 100 S.Ct. at 968. Moreover, in *Transamerica Mortgage Advisors v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), the case on which plaintiffs chiefly rely for their monetary-equitable relief distinction, the Court did not indicate there is any such inherent distinction for purposes of implying private statutory remedies. Rather, the Court recognized a private injunction remedy while denying a private damage remedy only because the statute at issue specifically conferred on members of plaintiffs' class a federal right to equitable relief while it conferred no similar right to money damages. *Transamerica* simply holds that the statutory language from which a private remedy can be inferred can also act to limit the remedies available. It is consistent with the general rule that the availability of a private remedy and the availability of a particular form of relief involve two different questions. *See, e. g., Bell v. Hood*, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 ("where legal rights [are] invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done."). While a court may find one form of relief more appropriate than another *once a private remedy is found*, "the question of whether a litigant has a 'cause of action' is analytically distinct and prior to the question of what relief, if any, a litigant may be entitled to receive." *Davis v. Passman*, 442 U.S. 228, 239, 99 S.Ct. 2264, 2274, 60 L.Ed.2d 846 (1979).

class, argue that the section's proscriptive provisions especially benefit them as "members of the public" and "their privately funded lobby groups." The argument proves too much. Virtually any general prohibition acts benefit some identifiable class more than the populace as a whole. In *Cort v. Ash*, for example, where the Supreme Court denied a private remedy to enforce a statutory ban on corporate political contributions, the shareholder-plaintiff argued that the ban was meant especially to protect corporate shareholders. See 422 U.S. at 81, 95 S.Ct. at 2089. The Supreme Court rejected this argument, emphasizing that the primary concern of the ban was to check the corrupting political influence of large corporate contributions. The Court contrasted the shareholder-plaintiff's claim with cases in which there was

> a clearly articulated federal right in the plaintiff, *e. g., Bivens v. Six Unknown Federal Narcotics Agents,* [403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619] *supra,* or a pervasive legislative scheme governing the relationship between the plaintiff class and the defendant class in a particular regard, *e. g., J. I. Case Co. v. Borak,* [377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423] *supra.*

*Id.* at 82, 95 S.Ct. at 2089. The Union and DeVaughn, are, at best, in the position of the shareholder-plaintiff in *Cort.* Although they may be secondary beneficiaries of the statute and benefited thereby more than the polity as a whole, the language and structure of the statute evince no intention to benefit them as a special class.

Nor is there any legislative history rebutting this inference that the statute was not meant to especially benefit lobbying groups or their members. The legislative history of 18 U.S.C. § 1913 consists largely of comments made on the floor of the House when the predecessor of section 1913 was enacted in 1919:

> The bill also contains a provision which I am frank to say is subject to a point of order. It is new legislation, but it will prohibit a practice that has been indulged in so often, without regard to what administration is in power—the practice of

a bureau chief or the head of a department writing letters throughout the country, sending telegrams throughout the country, for this organization, for this man, for that company to write his Congressman, to wire his Congressman, in behalf of this or that legislation. [Applause.] The gentleman from Kentucky, Mr. Sherley, former chairman of this committee, during the closing days of the last Congress was greatly worried because he had on his desk thousands upon thousands of telegrams that had been started right here in Washington by some official wiring out for people to wire Congressman Sherley for his appropriation and for that. Now, they use the contingent fund for that purpose, and I have no doubt that the telegrams sent for that purpose cost the Government more than $7,500. Now, it was never the intention of Congress to appropriate money for this purpose, and section 5 of the bill will absolutely put a stop to that sort of thing. [Applause.]

58 Cong.Rec. 403 (1919) (remarks of Representative Good).

If that language can be read to reflect an intent to protect any special class of beneficiaries, they are individual Congressmen, not private organizations such as the Union or individual federal employees such as DeVaughn. And to the extent section 1913 does especially protect Members of Congress, its ultimate and primary purpose may well be simply to benefit the public—which funds the Treasury and lives under the laws Congress enacts. However that may be, the fact that section 1913 might be said to confer special benefits on the class of Congressmen does not mean a private remedy should be inferred on behalf of the class members where, as here, other indicia of congressional intent weigh heavily against such a remedy. *See, e. g., Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 24, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979) ("mere fact that the statute was designed to protect advisers' clients does not require the implication of a private cause of action for damages on their be-

half"); *accord, Touche Ross & Co. v. Redington,* 442 U.S. 560, 578, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979).

Strong evidence that no private remedy was intended for section 1913 lies in the fact that Congress considered the need for specific remedies and provided two—criminal sanctions and removal from office.[7] The impression that the enacting Congress thought these remedies adequate is reinforced by the final report of a Select Committee commissioned by the House of Representatives in 1949 to review the need for regulation of lobbying, including lobbying by public agencies.[8] After studying the problem, the Committee concluded

> The existing law in this field [18 U.S.C. § 1913,] unlike the law governing lobby by private interests, is not directed toward obtaining information of such activities, but is prohibitory in concept and character. It forbids the use of appropriated funds for certain types of lobbying activities and is specifically a part of the Criminal Code. Enacted in 1919, it is not a recent or in any sense a novel piece of legislation. Its validity has never been challenged and we consider it sound law. We believe that this statute, together with ... other continuing safeguards ..., provide adequate means for ascertaining and checking any abuse of the executive role in the legislative process.... [T]he General Accounting Office, an arm of Congress, serves as an auditor of expenditures by the executive branch. The Congress itself through its power over the budgets of executive departments and agencies can, and, from time to time, does impose specific restraints on executive expenditures and activities that might affect legislative policy. Moreover, both Houses maintain

standing Committees on Expenditures in the Executive Departments which can and do stand watch against abuses. In addition, special and select committees of the Senate or House are set up from time to time to make particular studies and reports on various aspects of executive operations, including in some cases matters bearing on the formulation and promotion of legislative policy.

> It is our conclusion that *the long-established criminal statute* referred to above *should be retained intact and* that *Congress,* through the proper exercise of its powers to appropriate funds and to investigate conditions and practices of the executive branch, as well as through its financial watch dog, the General Accounting Office, *can* and should *remain vigilant against any improper use of appropriated funds* and any invasion of the legislative prerogatives and responsibilities of the Congress.

H.R.Rep.No.3239, 81st Cong., 2d Sess. 36 (1951) (footnote omitted) (emphasis added). No more in 1951 than in 1919, then, was there any inkling of a perceived need to enlist the aid of private attorneys general to curtail prohibited lobbying. The existing array of remedies to check unlawful agency lobbying was perceived as adequate.

Plaintiffs nevertheless contend that there is a compelling need for a private remedy. They report that no one has been criminally prosecuted or removed from office under section 1913 in the more than sixty years since its passage, and emphasize the third *Cort v. Ash* factor—whether a private remedy is consistent with or necessary to the congressional purpose. A similar argument influenced the decision to infer a private section 1913 remedy in *National Association for Community Development v. Hodgson,* 356 F.Supp. 1399, 1403–04 (D.D.C.1973).

---

7. See text of section 1913 in text preceding note 1 *supra.*

8. The Committee was

> authorized and directed to conduct a study and investigation of (1) all lobbying activities intended to influence, encourage, promote, or retard legislation; and (2) all activities of agencies of the Federal Government intended

to influence, encourage, promote, or retard legislation.

It was directed to submit, "prior to the close of the present Congress[,] ... its final report on the results of its study and investigation together with such recommendations as it deems advisable." H.R.Rep.No.3138, 81st Cong., 2d Sess. 1 (1950).

Now, however, as the district court recognized in overruling *Hodgson*,[9] this need-for-a-remedy argument does not pull the weight it once did. In 1964, while inferring a cause of action under the Securities Exchange Act, the Supreme Court stated that "under the circumstances here it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose." *J. I. Case Co. v. Borak*, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964). The Court has since modified its approach:

> To the extent our analysis in today's decision differs from that of the Court in *Borak*, it suffices to say that in a series of cases since *Borak* we have adhered to a stricter standard for the implication of private causes of action, and we follow that stricter standard today. *Cannon v. University of Chicago, supra*, [441 U.S.] at 688–709, 99 S.Ct. at 1953–1964. *The ultimate question is one of congressional intent, not one of whether this Court thinks it can improve upon the statutory scheme that Congress enacted into law.*

*Touche Ross & Co. v. Redington*, 442 U.S. 560, 578, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979) (emphasis added). The Court has thus recognized it is not within the judicial province to assess the usefulness or desirability of a private remedy when examination of more reliable indicia of congressional intent has revealed that Congress did not mean to create one. *Accord, California v. Sierra Club*, —— U.S. ——, ——, 101 S.Ct. 1775, 1781, 68 L.Ed.2d 101 (1981) ("The federal judiciary will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide."); *Universities Research Ass'n, Inc. v. Coutu*, 450 U.S. 754, 770–775, 101 S.Ct. 1451, 1461–63, 67 L.Ed.2d 662 (1981); *Transamerica Mortgage Advisors v. Lewis*, 444 U.S. 11, 23–24, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979). We conclude that section 1913 creates no private right of action.

**B. Section 607(a)**

Judge Flannery ruled that plaintiffs' claim with respect to section 607(a) "has no more basis in the legislative history or the language or logic of the statute than with respect to section 1913." 482 F.Supp. at 1125. We agree. Section 607(a) prohibits expenditure of congressionally appropriated money "for publicity or propaganda purposes designated to support or defeat legislation pending before Congress."[10] This prohibitory language is of the same general character found in section 1913. Indeed, section 607(a) is even more general than section 1913, which at least mentions "Members of Congress." To the extent section 607 implicates any congressional interest, it is only the generalized interest that appropriations be spent in accordance with law. The language of section 607 simply fails to support plaintiffs' claim that the section confers special benefits on individual lobbying groups, federal employees, or Congressmen.

Nor can plaintiffs make their case on the basis of the legislative history. They rely on comments made on the House floor about one of section 607's predecessor bills. These comments addressed the merits of a spending limitation in the 1952 Labor Department appropriations bill, which read, "No part of any appropriation contained in this act shall be used for publicity or propaganda purposes not heretofore authorized by the Congress." 97 Cong.Rec. 4098 (1951). The author of the spending limitation stated, "the American people are fed up with political and propaganda handouts from the Federal Government. This is an abuse that strikes directly at our free institutions." *Id.* at 4099 (remarks of Representative Smith). A supporter of the bill added:

> There is far more than merely the amount of money involved in this particular principle. I have previously urged my belief that it is necessary to strengthen the Congress in the interest of formulating national policy by the people them-

---

**9.** See note 5 *supra*.

**10.** The full text of section 607(a) is in text preceding note 1 *supra*.

selves. It is corollary to that principle that public opinion ought not be subjected to influence and direction by the executive agencies, the administrative branch of the Government, in the manner that it is today. In a democracy, where public opinion rules in the long run, the media of communication: the press, the radio, television, and the printed word, are very potent weapons in the control of the affairs of this country. The people should not finance use of these agencies to foster and perpetuate the bureaucrats—not the people's objectives in national policy.

*Id.* (remarks of Congressman Meader). To argue that these comments evince a desire to confer special benefits on individual lobbying groups and Congressmen is to stretch things a bit too far. The evident purpose of the anti-"propaganda" limitations is to curtail bureaucratic aggrandizement at the taxpayers' expense.[11] The legislative history, like the language of the statute, emphasizes conduct of the violator rather than protection for specified victims.

The inference that section 607 implies no private remedy becomes still stronger when the section is viewed against the background of 31 U.S.C. § 53(a), (c). These provisions require the Comptroller Controller to "investigate . . . all matters relating to the receipt, disbursement, and application of public funds," and to "specially report to Congress every expenditure . . . made by any department or establishment in any year in violation of law." By means of this and other safeguards,[12] Congress itself is in a position to monitor and enforce its spending limitations. It is not for us to question the effectiveness of existing remedies and infer additional remedies when Congress has so strongly indicated that no private remedy was intended.

We thus conclude that neither 18 U.S.C. § 1913 nor section 607(a) of Pub.L.No.95–429 creates a private right of action. This disposition makes it unnecessary to decide whether the scope of either section extends to the acts alleged in plaintiffs' complaint. The decision of the District Court is affirmed.

*Judgment accordingly*

WALD, Circuit Judge, concurring in the result:

I would affirm the decision of the district court, but for different reasons from the majority. Appellants seek two primary kinds of relief: an injunction to prevent any future attempts by appellee, Campbell, to influence legislation using Congressionally appropriated funds; and an injunction requiring Campbell to reimburse the Treasury for any money unlawfully spent on the alleged lobbying activities. The first issue is moot under *Network Project v. Corporation for Public Broadcasting,* 561 F.2d 963, 966–68 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1068, 98 S.Ct. 1247, 55 L.Ed.2d 770 (1978), since Campbell is no longer a federal official and there is no suggestion that his past acts represented official governmental policy. As to the second issue, I believe that the statutes[1] under which appellants sue provide no right to demand reimbursement to the United States Treasury for funds alleged to have been unlawfully spent by appellee. I would therefore affirm the decision of the district court without reaching the far more difficult issue of whether either section 607(a) of Pub.L.No.95–429 or 18 U.S.C. § 1913 creates a private right of action under any circumstances. We need not stretch to decide that important question here, and indeed we should not do so on so skimpy a record.

---

11. In offering a similar anti-lobbying amendment to another appropriation bill, Representative Smith offered the further explanation that "the Government is engaged in the business of directing public thinking. This amendment is merely an effort to stop that practice." 97 Cong.Rec. 4741 (1951).

12. Other safeguards include the use of investigative congressional committees, specific spending restraints, and termination of funding. See H.R.Rep.No.3239, 81st Cong., 2d Sess. 36 (1951), *quoted in* text following note 8 *supra.*

1. Appellants seek relief under section 607(a) of Pub.L.No.95–429, 92 Stat. 1001, 1016 (1978), and under 18 U.S.C. § 1913.

In my view, appellants' only non-moot claim rests on a bare assertion that funds of the United States have been unlawfully spent by Campbell in mailing copies of a letter to newspaper editors, and that the funds must therefore be refunded.[2] But in order to proceed on that claim appellants must show some statutory basis for their right to demand return of the funds to the Treasury. The majority opinion too facilely slides past the question of whether either section 607(a) or 18 U.S.C. § 1913 provides any basis for this demand, and instead reaches out to decide that neither section 607(a) nor 18 U.S.C. § 1913 creates any private right of action whatsoever. Such a holding is unnecessary, because even assuming *arguendo* that a private right of action does exist, appellants' claim for return of the funds must be dismissed because the statutes do not provide any basis for an action by private persons seeking reimbursement of funds to the Treasury. Appellants therefore have failed to state a claim for which relief could be granted under the cited laws. *Cf.* 31 U.S.C. § 505 (Justice Department may sue to recover funds from persons "accountable for public money").

Unlike the majority, I would not foreclose for all time and under all circumstances the possibility that *some* private party might on *some other facts* be able to state a claim for relief under these laws. It is possible that a Congressman or a group of potential beneficiaries may state a valid claim under these statutes if, for example, either sought a prohibitory injunction against a continuing, unlawful lobbying campaign conducted against one of the Congressman's bills. *See generally Goldwater v. Carter*, 617 F.2d 697 (D.C.Cir.) (en banc), *judgment vacated*, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) (Mem.); *Kennedy v. Sampson*, 511 F.2d 430 (D.C.Cir.1974) (cases discussing standing of members of Congress); McGowan, *Congressmen in Court: The New Plaintiffs*, 15 Ga.L.Rev. 241 (1981). Should such a case arise, it would provide a far more appropriate context for deciding whether any implied private right of action exists pursuant to the standards of *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975); *see California v. Sierra Club*, —— U.S. ——, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981) (explaining proper application of *Cort v. Ash* standards).

I would therefore affirm the district court's dismissal simply on the ground that appellants' first claim is moot, and that as to the only conceivable non-moot claim (the injunction for reimbursement), appellants have failed to state a, claim upon which relief under these laws could be granted.

---

2. The amount of money involved may well be *de minimis* and hence unworthy of litigation.