# United States Court of Appeals for the Federal Circuit

06-5023

UNITED PACIFIC INSURANCE COMPANY,
RELIANCE INSURANCE COMPANY,
and RELIANCE NATIONAL,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

Gary A. Wilson, Post & Schell, PC, of Philadelphia, Pennsylvania, argued for plaintiffs-appellants.

Michael N. O'Connell, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and James M. Kinsella, Deputy Director.

Appealed from: United States Court of Federal Claims

Judge Nancy B. Firestone

# United States Court of Appeals for the Federal Circuit

06-5023

UNITED PACIFIC INSURANCE COMPANY,
RELIANCE INSURANCE COMPANY,
and RELIANCE NATIONAL,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

---

DECIDED: September 20, 2006

---

Before SCHALL, LINN, and DYK, Circuit Judges.

SCHALL, Circuit Judge.

United Pacific Insurance Company, Reliance Insurance Company, and Reliance National (collectively, "United Pacific") brought suit against the government in the United States Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491(a)(1). In its suit, United Pacific, which had acted as a Miller Act surety in connection with a government construction project, sought to recover in quantum meruit the amount over and above the original contract price that it was required to pay in order to complete the project after the contractor defaulted. United Pacific alleged that it was entitled to quantum meruit recovery because the contract at issue was illegal and therefore void ab initio.

According to United Pacific, the contract was illegal because it was entered into in violation of two statutes, 10 U.S.C. § 2805 (1994) (amended 2000) and 10 U.S.C. § 2811 (1994) (amended 2000), which set forth expenditure limitations and require oversight in connection with certain military construction projects.[1] United Pacific now appeals the decision of the Court of Federal Claims dismissing its suit pursuant to Court of Federal Claims Rule 12(b)(6) for failure to state a claim upon which relief could be granted. United Pac. Ins. Co. v. United States, 68 Fed. Cl. 152, 162 (2005) ("Trial Court Opinion"). We affirm.

BACKGROUND

I.

On October 5, 1995, the United States, through the Contracting Squadron at McGuire Air Force Base in New Jersey, entered into a contract with Castle Abatement Corporation ("Castle"). Under the contract, the government agreed to pay Castle $3,152,174 to provide labor, material, and equipment to renovate three buildings at McGuire Air Force Base.

In accordance with the Miller Act, 40 U.S.C. §§ 270a-d (1994) (current version at 40 U.S.C. §§ 3131-3134 (2000 & Supp. 2002)), United Pacific issued a performance bond in the penal sum of $3,152,174 and a labor and material bond in the penal sum of $1,576,087 to the government as obligee.[2] On July 21, 1997, the government

---

[1] In this opinion, we cite to the versions of sections 2805 and 2811 that were in effect in 1995 when the contract at issue was formed.

[2] "The Miller Act requires prime contractors to post performance bonds on all federal construction contracts." Ins. Co. of the W. v. United States, 243 F.3d 1367, 1370 (Fed. Cir. 2001) (citing 40 U.S.C. § 270a). "Under a performance bond, a surety guarantees that the project will be completed if a contractor defaults." Dependable Ins. Co. v. United States, 846 F.2d 65, 66 (Fed. Cir. 1988) (citing Aetna Cas. & Sur. Co. v.

terminated its contract with Castle for default. In response to the government's demand to United Pacific under the performance bond, United Pacific entered into a written takeover agreement with the government in which it agreed to complete the contract work. United Pacific then hired a contractor, Lattimer & Associates, to complete the work. Lattimer eventually completed the contract work at a total cost to United Pacific of $3,525,757.25. At the same time, United Pacific only received a total of $661,512.31 in payments from the government under the contract. That sum apparently represented the balance of the original contract price.

## II.

On April 12, 2000, United Pacific filed a request for an equitable adjustment with the contracting officer, claiming that the contract between Castle and the government was void ab initio because it was illegal. United Pacific asked the contracting officer to terminate the contract for the convenience of the government and to pay it the sum of $3,194,490.59. This sum represented the costs United Pacific allegedly incurred in completing the contract work, less the $661,572.31 in payments that it had received from the government. After the contracting officer denied the claim, United Pacific filed an appeal with the Armed Services Board of Contract Appeals ("Board").

On July 20, 2001, the Board issued a decision holding that United Pacific was without standing to assert Castle's pre-takeover claim that the contract was illegal. In re

---

(Cont'd. . . .)
United States, 845 F.2d 971, 973 (Fed. Cir. 1988)). The bond "is designed to ensure 'that the government is not left with a partially completed project because of an insolvent contractor.'" Id. at 66-67 (quoting Morrison Assurance Co. v. United States, 3 Cl. Ct. 626, 632 (1983)). In addition to the performance bond requirement of 40 U.S.C. § 131(b)(1), the Miller Act also requires prime contractors to secure a payment bond with a surety satisfactory to the government "for the protection of all persons supplying labor and material . . . ." 40 U.S.C. § 3131(b)(2).

United Pac. Ins. Co., ASBCA No. 53051, 01-2 B.C.A. ¶ 31,527, at 155,640, 2001 WL 865380 (July 20, 2001). Shortly thereafter, however, we decided Fireman's Fund Insurance Fund Co. v. England, 313 F.3d 1344 (Fed. Cir. 2002). In Fireman's Fund, we held that the Contract Disputes Act, 41 U.S.C. §§ 601-613, did not give the Board jurisdiction over equitable subrogation claims based on events that took place before a takeover agreement. 313 F.3d at 1352. Based upon Fireman's Fund, the Board issued a reconsideration decision in which it rejected United Pacific's claim on jurisdictional grounds, ruling that United Pacific was not a "contractor" within the meaning of the Contracts Disputes Act with respect to pre-takeover agreement events. In re United Pac. Ins. Co., ASBCA No. 53051, 03-2 B.C.A. ¶ 32267, at 159,622, 2003 WL 21350374 (June 4, 2003). In United Pacific Insurance Co. v. Roche, 380 F.3d 1352, 1358 (Fed. Cir. 2004), we affirmed the Board's decision. We held that because "[a]ll of these alleged overpayments to Castle . . . were made prior to the takeover agreement, at a time when United [Pacific] was not yet a 'contractor' with the United States," the Board "correctly concluded that it lacked jurisdiction over the claims." Id. at 1356.

On January 12, 2005, United Pacific filed suit in the Court of Federal Claims under the Tucker Act, alleging that the contract between Castle and the government was illegal, and therefore void ab initio, because it was in violation of 10 U.S.C. §§ 2805 and 2811. Consequently, United Pacific urged, as the completing surety, it was entitled to recover its excess costs of completion on a quantum meruit basis. On September 28, 2005, the Court of Federal Claims dismissed United Pacific's suit under Court of Federal Claims Rule 12(b)(6) for failure to state a claim upon which relief could be granted. Trial Court Opinion, 68 Fed. Cl. at 162. The court did so, inter alia, on the

ground that United Pacific's suit was foreclosed by our decision in American Telephone & Telegraph Co. v. United States, 177 F.3d 1368 (Fed. Cir. 1999) (en banc) ("AT&T III"). Trial Court Opinion, 68 Fed. Cl. at 156-59. At the same time, the court rejected United Pacific's reliance on United States v. Amdahl, 786 F.2d 387 (Fed. Cir. 1986), and Godley v. United States, 5 F.3d 1473 (Fed. Cir. 1993). Trial Court Opinion, 68 Fed. Cl. at 159 & n.3. This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

### I.

"A motion to dismiss . . . for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the plaintiff do not entitle him to a legal remedy." Boyle v. United States, 200 F.3d 1369, 1372 (Fed. Cir. 2000). "In reviewing a dismissal for failure to state a claim, we must assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant." Anaheim Gardens v. United States, 444 F.3d 1309, 1314-15 (Fed. Cir. 2006) (quoting Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991)). We review de novo whether the Court of Federal Claims properly dismissed a complaint for failure to state a claim. Id. at 1314 (citing Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir. 2002); Dehne v. United States, 970 F.2d 890, 892 (Fed. Cir. 1992)).

### II.

At the time Castle and the government entered into their contract, section 2805, titled "Unspecified minor construction," provided in relevant part:

> (a)(1) Except as provided in paragraph (2), within an amount
> equal to 125 percent of the amount authorized by law for

such purpose, the Secretary concerned may carry out minor military construction projects not otherwise authorized by law. A minor military construction project is a military construction project (1) that is for a single undertaking at a military installation, and (2) that has an approved cost equal to or less than $1,500,000.

(2) A Secretary may not use more than $5,000,000 for exercise-related unspecified minor military construction projects coordinated or directed by the Joint Chiefs of Staff outside the United States during any fiscal year.

(b)(1) A minor military construction project costing more than $500,000 may not be carried out under this section unless approved in advance by the Secretary concerned.

(2) When a decision is made to carry out a minor military construction project to which paragraph (1) is applicable, the Secretary concerned shall notify in writing the appropriate committees of Congress of that decision, of the justification for the project, and of the estimated cost of the project. The project may then be carried out only after the end of the 21-day period beginning on the date the notification is received by the committees.

(c)(1) Except as provided in paragraph (2), the Secretary concerned may spend from appropriations available for operation and maintenance amounts necessary to carry out an unspecified military construction project costing not more than $300,000. . . .

10 U.S.C. § 2805 (emphases added). Section 2811, titled "Repair of facilities," provided in relevant part:

(a) **Repairs using operational and maintenance funds**.— Using funds available to the Secretary concerned for operation and maintenance, the Secretary concerned may carry, out repair projects for an entire single-purpose facility or one or more functional areas of a multipurpose facility.

(b) **Approval required for major repairs**.—A repair project costing more than $5,000,000 may not be carried out under this section unless approved in advance by the Secretary concerned. In determining the total cost of a repair project, the Secretary shall include all phases of a multi-year repair

project to a single facility. In considering a repair project for approval, the Secretary shall ensure that the project is consistent with force structure plans, that repair of the facility is more cost effective than replacement, and that the project is an appropriate use of operation and maintenance funds.

(c) **Prohibition on new construction or additions**.— <u>Construction of new facilities or additions to existing facilities may not be carried out under the authority of this section</u>.

10 U.S.C. § 2811 (emphasis added).

On appeal, as it did in the Court of Federal Claims, United Pacific contends that

[t]he [g]overnment voided the [c]ontract through its violation of public policy by illegally using repair and maintenance funds for new construction in clear violation of 10 U.S.C. § 2805, which absolutely prohibited use of operation and maintenance funds ("O&M funds") for unspecified repairs exceeding $300,000, and 10 U.S.C. § 2811, which prohibited use of O&M funds in any amount for any new construction.

Appellant's Br. at 10. According to United Pacific, the contract between Castle and the government was illegal, and therefore void ab initio, for violating 10 U.S.C. §§ 2805 and 2811 in three ways:

(1)    By characterizing over $2 million of the Project as Operations and Maintenance work rather than new construction, when the vast majority of the work constituted new construction as defined by Air Force Regulations;

(2)    By engaging in contract splitting by claiming that the Project was three separate buildings when the facts show that there was one Project involving interrelated buildings (in order to stay under the $300,000 limit); and

(3)    By accepting an unjustified bid of $3,000 for constructing the connectors for the buildings when its own estimate was $134,000 and the next two lowest bids were $290,000 and $344,000, respectively, (to keep each artificially divided project under $300,000).

Id. at 4-5.

United Pacific asserts that "[w]hile compensated sureties must complete legal contracts properly terminated by the Government, a surety would never issue a bond for or complete a known illegal / void contract." Id. at 12. It reasons that "where the public policy was clearly violated and the [c]ontract is determined to be void, [United Pacific], as the completing surety, is entitled to recover its excess costs of completion, incurred in good faith, on a quantum meruit basis." Id. As it did in the Court of Federal Claims, United Pacific relies on Amdahl and Godley for the proposition that "the [g]overnment must pay for the benefits it has received and accepted from the surety because . . . United Pacific completed the illegal / void [c]ontract in good faith without knowledge of the illegality, costs which would not have been incurred but for the illegal [c]ontract and violation of public policy." Id. As seen, United Pacific seeks quantum meruit recovery of approximately $2,800,000, which is both the amount that it paid above and beyond the contract price and the amount that it alleges by which the government benefited from its completion of the contract.

The government responds that neither Castle nor United Pacific was entitled to have the contract declared void for a violation of either 10 U.S.C. §§ 2805 or 2811. Moreover, the government asserts that United Pacific's cause of action is foreclosed by our en banc decision in AT&T III, 177 F.3d 1368.

III.

Quantum meruit is "[a] claim or right of action for the reasonable value of services rendered." Black's Law Dictionary 1276 (8th ed. 2004). In Amdahl, we explained that

> [w]here a benefit has been conferred by the contractor on
> the government in the form of goods or services, which it

accepted, a contractor may recover at least on a <u>quantum valebant</u> or <u>quantum meruit</u> basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity. The contractor is not compensated under the contract, but rather under an implied-in-fact contract.

786 F.2d at 393 (footnote omitted).[3]

We begin our analysis with the language of the statutes. As can be seen from the text quoted above, neither section 2805 nor section 2811 provides for the invalidation of a contract found to violate its provisions. Neither does the legislative history support United Pacific's claim.

Prior to 1982, each year, as part of the military construction annual appropriations bills, Congress enacted provisions similar to sections 2805 and 2811 relating to military construction and military housing. In 1982, Congress codified these provisions. <u>See</u> Military Construction Codification Act, Pub. L. No. 97-214, § 2, 96 Stat. 153 (1982). The House Report that accompanied the bill explained that the bill's purpose was "decentralization," allowing "greater flexibility" and placement of responsibility at the lower levels of the agency in obligating military construction funds. H.R. Rep. No. 97-612 (1982), <u>reprinted in</u> 1982 U.S.C.C.A.N. 441, 444. In its summary of new annual reporting requirements created by the bill for "unspecified minor construction," the House Report stated:

---

[3] <u>Quantum valebant</u> is "[t]he reasonable value of goods and materials." <u>Black's Law Dictionary</u> 1276 (8th ed. 2004). In general, the difference between quantum meruit and <u>quantum valebant</u> is that "[t]he former is said to apply to services and the latter to goods . . . ." <u>Urban Data Sys., Inc. v. United States</u>, 699 F.2d 1147, 1154 n.8 (Fed. Cir. 1983). United Pacific does not seek recovery on a <u>quantum valebant</u> basis.

> Information supplied should <u>enable the appropriate committees of Congress to monitor the relationships between budget requests and obligations</u> for unspecified minor construction projects funded from military construction appropriations and unspecified minor construction projects funded from operations and maintenance appropriations. The maintenance and repair backlog at the end of the prior fiscal year will be used to evaluate the ratio of expenditures between minor construction and maintenance and repair. Data for the two fiscal years prior to the budget year should be supplied to evaluate trends.

<u>Id.</u> at 446 (emphasis added). The Armed Services Committee report discussing oversight of the use of operation and maintenance funds under section 2805(c)(1), stated:

> Since the Committee's objective for minor construction has been to increase a military department's flexibility in managing minor construction, the use of operations and maintenance funds for minor construction was retained. However . . . the Committee believes that annual reporting procedures to <u>provide better oversight on operation and maintenance expenditures</u> for minor construction is necessary. The Committee is most concerned that operations and maintenance funds used for minor construction may be at the expense of needed repair and maintenance of facilities.

<u>Id.</u> at 458 (emphasis added). Lastly, a conference report relating to the 1994 amendments to section 2811 provided:

> The conferees are concerned that major repairs to facilities, funded through operation and maintenance accounts, are conducted <u>without the oversight of the service secretaries or the Committees on Armed Services of the Senate and House of Representatives</u>. The conferees believe improved oversight of the major repairs is required, but do not want to impose additional reporting requirements.

H.R. Conf. Rep. No. 103-701, at 789 (1994), reprinted in 1994 U.S.C.C.A.N. 2224, 2358 (emphasis added).[4]

We think the relevant legislative history makes it clear that the purposes behind sections 2805 and 2811 were agency flexibility through decentralization, as well as the limitation of spending and waste through Congressional oversight. It does not appear that a purpose was to enable contractors to assert private causes of action to void contracts with the government that violate the statutes at issue.

IV.

Our en banc opinion in AT&T III is dispositive of United Pacific's appeal. In AT&T III, we addressed a situation in which, after incurring expenses in excess of a contract's fixed price, AT&T attempted to invalidate the contract for failing to comply with federal statutes. 177 F.3d at 1370. "The Navy awarded the . . . contract to AT&T as a fixed-price contract just nine days after enactment of section 8118" of the Department of

---

[4]    Prior to the 1994 amendments, section 2811 provided:

(a) The Secretary concerned may carry out renovation projects that combine maintenance, repair, and minor construction projects for an entire single-purpose facility, or one or more functional areas of a multipurpose facility, using funds available for operations and maintenance.

(b) The amount obligated on such a renovation project may not exceed the maximum amount specified by law for a minor project under section 2805 of this title.

(c) Construction of new facilities or additions to existing facilities may not be carried out under the authority of this section.

Defense Act, Pub. L. No. 100-202, § 8118, 101 Stat. 1329, 1329-84 (1987).[5] Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1377 (Fed. Cir. 2002) ("AT&T V").[6] Contrary to section 8118's provisions, the Navy awarded the contract at issue, which was in excess of $10,000,000, for the development of a major system or subsystem without the written determination of the Under Secretary of Defense for Acquisition that program risk had been reduced such that realistic pricing could occur. Id. Furthermore, the Navy did not comply with the quarterly reporting provision. See id. "AT&T eventually

---

[5]  Section 8118 stated:

> None of the funds provided for the Department of Defense in this Act may be obligated or expended for fixed price-type contracts in excess of $10,000,000 for the development of a major system or subsystem unless the Under Secretary of Defense for Acquisition determines, in writing, that program risk has been reduced to the extent that realistic pricing can occur, and that the contract type permits an equitable and sensible allocation of program risk between the contracting parties: Provided, That the Under Secretary may not delegate this authority to any persons who hold a position in the Office of the Secretary of Defense below the level of Assistant Under Secretary of Defense: Provided further, That the Under Secretary report to the Committees on Appropriations of the Senate and House of Representatives in writing, on a quarterly basis, the contracts which have obligated funds under such a fixed price-type developmental contract.

Department of Defense Act, Pub. L. No. 100-202, § 8118, 101 Stat. 1329, 1329-84 (1987) (emphases added).

[6]  After AT&T III remanded the case to the "Court of Federal Claims to determine what remedy, if any, was available to AT&T for the Navy's violation of section 8118," the Court of Federal Claims held that "non-compliance with [section 8118] is not an actionable wrong. . . . [P]laintiffs cannot claim a protectable interest in the proper application of Section 8118 for Congress intended to give them none." AT&T V, 307 F.3d at 1377 (quoting Am. Tel. & Tel. Co. v. United States, 48 Fed. Cl. 156, 160 (2000) ("AT&T IV")). AT&T V was the appeal to this court from AT&T IV.

performed [the] contract at a cost of over $91 million, greatly in excess of the contract's adjusted final price of about $34.5 million." Id.

One of several purposes of section 8118 was to address the "burden of a fixed price contract on the contractor when the miscalculation of development cost may have been that of the government agency as well as the contractor." AT&T III, 177 F.3d at 1372 (citing H.R. Conf. Rep. No. 100-498 at 624 (Dec. 22, 1987)). AT&T argued that the statute was enacted at least in part for its protection, and that the agency, by failing to comply with the statute, deprived it of the protection provided by the law. Id. at 1373. AT&T argued that section 8118 was a "mandatory statute" restricting the agency's authority to obligate and expend funds, and that the Navy's direct contravention of the statute rendered its contract void ab initio. Id.

Sitting en banc, we rejected AT&T's contentions, stating that "[i]nvalidation of the contract is not a necessary consequence when a statute or regulation has been contravened, but must be considered in light of the statutory or regulatory purpose, with recognition of the strong policy of supporting the integrity of contracts made by and with the United States." Id. at 1374. We explained that "the policy underlying the enactment must be considered in determining the remedy for its violation, when the statute itself does not announce the sanction of contract invalidity." Id.

In AT&T III, we examined the statutory language, the legislative history, and the history of the agency's administration of the statute. Having done so, we concluded that it was "clear that Congress did not intend that this enactment would terminate fully performed contracts because of this flawed compliance." Id. at 1375. Notably, the Senate Armed Services Committee explicitly stated:

> It is the intent of the committee that this section be applied in a manner that best serves the government's interests in the long term health of the defense industry, and that this section <u>not be used as the basis for litigating the propriety of an otherwise valid contract</u>. Nothing in this section shall be construed to affect the requirements of section 8118 of the Department of Defense Appropriations Act, 1988.

<u>Id.</u> (quoting S. Rep. No. 100-326, 100th Cong., 2d Sess. at 105 (May 4, 1988)) (emphasis in original). We concluded that these congressional statements, which were "made with knowledge of the agency's imperfect compliance with § 8118, negate any reasonable inference that Congress intended simply to render void ab initio, even after full performance, any fixed price contract for which the Under Secretary's review of risk allocation and the report to the Committees were omitted." <u>Id.</u> We reasoned, inter alia, that "Congress cannot have intended to charge the contracting partner with adverse consequences depending on whether the Defense Department carried out the internal responsibilities and filed the reports that Congress required." <u>Id.</u> Lastly, we stated: "Nor is it the judicial role to discipline the agency's noncompliance with the supervisory and reporting instructions of congressional oversight." <u>Id.</u> (citing <u>Longshore v. United States</u>, 77 F.3d 440, 443 (Fed. Cir. 1996) ("Congress has undoubted capacity to oversee the performance of Executive Branch agencies, consistent with its constitutional authority. It is not for this court to instruct Congress on how to oversee and manage its creations."); <u>Nat'l Treasury Employees Union v. Campbell</u>, 654 F.2d 784, 794 (D.C. Cir. 1981) (By statutory requirement that the Comptroller General report on certain expenditures, "Congress itself is in a position to monitor and enforce its spending limitations. It is not for us to question the effectiveness of existing remedies and infer additional remedies."); <u>E. Walters & Co. v. United States</u>, 576 F.2d 362, 367 (Ct. Cl. 1978) ("The fact that a procurement practice is prohibited does not necessarily

mean that it is therefore actionable.  The discipline to be administered in such cases is a responsibility of the cognizant procurement officials within the agency [and not] by this court.")).

In our view, AT&T III compels the conclusion that United Pacific is not entitled to the relief it seeks: a determination that the contract between Castle and the government was illegal, and therefore void ab initio, by reason of non-compliance with 10 U.S.C. §§ 2805 and 2811.

United Pacific attempts to distinguish AT&T III on the ground that the legislative history of the statute at issue, section 8118, explicitly barred any private cause of action. We are not persuaded by this argument.  It is true that the legislative history of sections 2805 and 2811 does not reveal a prohibition similar to the one quoted above for section 8118.  However, as the Court of Federal Claims recognized, neither section 2805 nor 2811 "specifically provides for the invalidation of contracts that were made in violation of it."  Trial Court Opinion, 68 Fed. Cl. at 158.  We explained in AT&T III that "[t]he invalidation of a contract after it has been fully performed is not favored."  177 F.3d at 1375.  In fact, "precedent shows that those contracts that have been nullified, based on a failure to meet a statutory or regulatory requirement, are contracts that have not been substantially performed."  Id.  We added: "Precedent does not favor the invalidation, based on governmental noncompliance with internal review and reporting procedures, of a contract that has been fully performed by either contracting party."  Id. at 1376; see id. (quoting Miss. Valley Generating Co., 364 U.S. at 563) (When a statute "does not specifically provide for the invalidation of contracts which are made in violation of [its provisions,]" the court shall inquire "whether the sanction of nonenforcement is

consistent with and essential to effectuating the public policy embodied in [the statute].").  Accordingly, AT&T III is not distinguishable on the basis of section 8118's explicit bar against a private cause of action.

We see no error in the Court of Federal Claims's rejection of United Pacific's reliance on Amdahl and Godley.  Amdahl involved a situation in which the government had already received performance in the form of goods or services, but then refused to pay for them, arguing that the contract was void.  Rejecting the government's position, we stated:

> [I]n many circumstances it would violate good conscience to impose upon the contractor all economic loss from having entered an illegal contract.  Where a benefit has been conferred by the contractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a quantum valebant or quantum meruit basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity. The contractor is not compensated under the contract, but rather under an implied-in-fact contract.

Amdahl, 786 F.2d at 393 (emphasis added).  We continued:

> Even though a contract be unenforceable against the Government, because . . . not authorized, . . . it is only fair and just that the Government pay for goods delivered or services rendered and accepted under it.  In certain limited fact situations, therefore, the courts will grant relief of a quasi-contractual nature when the Government elects to rescind an invalid contract.  No one would deny that ordinary principles of equity and justice preclude the United States from retaining the services, materials, and benefits and at the same time refusing to pay for them on the ground that the contracting officer's promise was unauthorized, or unenforceable for some other reason.  However, the basic fact of legal significance charging the Government with liability in these situations is its retention of benefits in the form of goods or services.

Id. (emphases added). Thus, <u>Amdahl</u> speaks to the situation in which the government receives the goods or services for which it contracted, but then seeks to avoid payment by arguing that the underlying contract was unlawful. That is not what happened here. Because it is undisputed that the government paid Castle and United Pacific the full amount required by the contract for the construction performed, <u>Amdahl</u> does not help United Pacific.

United Pacific's reliance on <u>Godley</u> also is misplaced. <u>Godley</u> was a breach of contract case. William C. Godley was the owner of a tract of land in North Carolina. He entered into a contract with the Postal Service, pursuant to which he built a postal facility on the tract and then leased the facility to the Postal Service, giving the Postal Service the option to buy after one year. <u>Godley</u>, 5 F.3d at 1474. After the term of the lease began, the Postal Service informed Godley that the lease was invalid, the reason being that Charles D. Paramore, the Postal Service agent who had negotiated with Godley, had been convicted of bribery and conspiracy in connection with several Postal Service contracts, although not Godley's contract. The Postal Service asserted, inter alia, that Godley's contract was tainted by Paramore's illegal conduct. Accordingly, it stopped paying the lease amount in the contract and offered to renegotiate its arrangement with Godley. <u>Id.</u> In due course, Godley filed suit in the Court of Federal Claims seeking the payments required by the original lease. The court granted summary judgment in favor of Godley, rejecting the government's argument that Godley's contract was void ab initio due to the alleged taint from Paramore's illegal conduct. <u>Id.</u> The government appealed.

On appeal, we stated that "the general rule is that a Government contract tainted by fraud or wrongdoing is void ab initio." Id. at 1476 (citing Miss. Valley Generating Co., 364 U.S. at 564). However, we further stated, "Illegal acts by a Government contracting agent do not alone taint a contract and invoke the void ab initio rule. Rather, the record must show some causal link between the illegality and the contract provisions. Determining whether illegality taints a contract involves questions of fact." Id.

On this basis, we vacated the decision of the Court of Federal Claims and remanded the case to the court for a determination as to whether Paramore's illegal conduct tainted the contract. We stated that, on the summary judgment record, we could not determine, and there were genuine issues of material fact as to, "whether Mr. Paramore's illegal conduct caused any unfavorable contract terms." Id. Significantly, in the course of our analysis, we pointed out that "[a] contract without the taint of fraud or wrongdoing . . . does not fall within [the rule that a government contract tainted by fraud or wrongdoing is void ab initio.]" Id. Godley does not help United Pacific. Unlike what occurred in that case, the government has paid in full the amount it agreed to pay Castle under the original contract, and it has never been asserted that the government's contract with Castle was "tainted by fraud or wrongdoing."

## CONCLUSION

For the foregoing reasons, the decision of the Court of Federal Claims dismissing United Pacific's cause of action for failure to state a claim upon which relief could be granted is affirmed.

## COSTS

Each party shall bear its own costs.

AFFIRMED