# Expenditure of Appropriated Funds for Informational Video News Releases

Informational video news releases produced by the Department of Health and Human Services regarding the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 do not constitute impermissible "covert propaganda" in violation of the Consolidated Appropriations Resolution, 2003, which forbids the expenditure of appropriated funds for "publicity or propaganda purposes."

July 30, 2004

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
DEPARTMENT OF HEALTH AND HUMAN SERVICES

On May 19, 2004, the General Accounting Office ("GAO")[1] opined that certain informational video news releases produced by the Department of Health and Human Services regarding the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 constitute impermissible "covert propaganda" in violation of the Consolidated Appropriations Resolution, 2003, which forbids the expenditure of appropriated funds for "publicity or propaganda purposes." You have asked for our views on the issue addressed in the GAO decision. We conclude, contrary to the GAO decision, that the expenditure of appropriated funds to produce and distribute the informational video news releases in question does not violate the prohibition on "propaganda."[*]

## I.

The Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), an agency within HHS, have produced three video news releases ("VNRs") to inform potential beneficiaries about the prescription drug benefits recently added to the Medicare program by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. No. 108-173, 117 Stat. 2066. The Consolidated Appropriations Resolution, 2003 ("CAR") provides that "[n]o part of any appropriation contained in this or any other Act shall be used for publicity or propaganda purposes within the United

---

[1] On July 7, 2004, the General Accounting Office was renamed the Government Accountability Office. GAO Human Capital Reform Act of 2004, Pub. L. No. 108-271, 118 Stat. 811.

[*] Editor's Note: Congress subsequently enacted a statute that supersedes this opinion. *See* Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005, Pub. L. No. 109-13, tit. VI, § 6076, 119 Stat. 231, 301 ("Unless otherwise authorized by existing law, none of the funds provided in this Act or any other Act, may be used by an executive branch agency to produce any prepackaged news story intended for broadcast or distribution in the United States unless the story includes a clear notification within the text or audio of the prepackaged news story that the prepackaged news story was prepared or funded by that executive branch agency.").

States not heretofore authorized by the Congress." Pub. L. No. 108-7, tit. VI, § 626, 117 Stat. 11, 470.[2] GAO recently opined that portions of the VNRs produced by HHS and CMS—the "story packages"—constitute so-called "covert propaganda" proscribed by the "publicity or propaganda" rider because they do not identify "HHS or CMS as the source [of the VNRs] to the targeted television audience, and the content of the news reports was attributed to individuals purporting to be reporters, but actually hired by an HHS subcontractor." *Department of Health and Human Services, Centers for Medicare & Medicaid Services—Video News Releases*, B-302710, at 16, 2004 WL 1114403, at *11 (Comp. Gen. May 19, 2004) ("GAO VNR Decision").

VNRs have become "'the television version of the printed press release.'" Letter for Gary Kepplinger, Deputy General Counsel, General Accounting Office, from Dennis G. Smith, Director, Centers for Medicare and Medicaid Services, Encl. 2 (Apr. 2, 2004) ("Smith Letter") (internal citation omitted). VNRs ordinarily consist of several segments that may be used in whole or in part by television stations and networks in producing their news programs: (i) slates (paper or video summaries of the VNR); (ii) B-roll film (video clips without sound or narration); and (iii) story packages (completed news stories, often combining the B-roll film with the information on the slates). *See* GAO VNR Decision at 2–3, 5–6, 2004 WL 1114403 at *2–*3; Smith Letter, Encl. 1. Television stations, which receive VNRs via satellite feed or mail, may draw on those segments as they see fit, and "most news organizations using VNR[s] . . . often use only a portion or edited versions of the materials provided." GAO VNR Decision at 4, 2004 WL 1114403, at *2.[3] It is estimated that between 78 and 100 percent of all television stations incorporate VNRs into their newscasts. *Id.* at 3 n.2, 2004 WL 1114403 at *2 n.2; Smith Letter, Encl. 1.

The use of VNRs has become widespread, in part because they provide "a more effective and targeted means to get news and information into the hands of broadcast professionals in an appropriate format" than do more traditional methods. Smith Letter, Encl. 1. They provide an especially convenient and cost-effective programming option for local news stations, many of which face budget constraints and may lack the resources to produce their own news report on a given topic. GAO VNR Decision at 4, 2004 WL 1114403, at *2. Since the early 1990s, VNRs have been

---

[2] Most appropriations statutes since 1951 have contained similar "publicity or propaganda" riders, which, as the language of this rider indicates, apply to all governmental entities receiving appropriated funds. *See generally Medicare Prescription Drug, Improvement, and Modernization Act of 2003—Use of Appropriated Funds for Flyer and Print and Television Advertisements*, B-302504, 2004 WL 523435 (Comp Gen. Mar. 10, 2004) ("GAO March 2004 Decision") (discussing history of "publicity or propaganda" riders). The identical appropriations rider appears in the Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, tit. VI, § 624, 118 Stat. 3, 356.

[3] Some journalistic codes of ethics call upon television stations to label and disclose the origin of all material provided by outsiders. GAO VNR Decision at 5 & nn.17–19, 2004 WL 1114403, at *3 & nn. 17–19.

regularly produced by "private corporations, nonprofit organizations and government entities." *Id.* at 2, 2004 WL 1114403 at *2. The use of VNRs by federal agencies subject to the "publicity or propaganda" appropriations riders appears to be the rule rather than the exception. From the Department of Agriculture to the Census Bureau to the Environmental Protection Agency, information is frequently made public through VNRs. *See* Website of Department of Agriculture, http://www.usda.gov/agency/oc/vtr/vnrframe.htm (last visited July 30, 2004) (providing over 100 VNRs produced by agency since 2001); Website of Census Bureau, http://www.census.gov/pubinfo/www/video/promote.html (last visited July 30, 2004) (providing "informative videos that reflect Census Bureau operations"); Website of Environmental Protection Agency, http://www.epa.gov/epahome/headline_011802.htm (last visited July 30, 2004) (providing VNR regarding home radon screening that features interviews with the Secretary, doctors, contractors, and homeowners).[4]

Members of Congress—who are bound by the same "publicity or propaganda" prohibition in annual congressional appropriations riders[5]—also have relied upon VNRs. Representative Frost, for example, issued a VNR describing his participation in a Congressional Business Summit. *See* Website of Rep. Frost, http://www.house.gov/frost/pr00/pr000508.htm (last visited July 30, 2004). In addition, members of Congress routinely release "radio actualities," which, like VNRs, address various issues and include interview clips. *See*, *e.g.*, Website of Sen. Stabenow, http://stabenow.senate.gov/press/actualities.htm (last visited July 30, 2004) (describing "radio actualities" as "group[s] of sound bites sent out to radio stations to be used in news reports" and providing eleven radio actualities); Website of Sen. Conrad, http://conrad.senate.gov/press/press.html (last visited July 30, 2004) (providing several "radio actualities," including audio clips of the senator being interviewed by an unidentified interviewer).

---

[4] *See also*, *e.g.*, Website of Consumer Product Safety Commission, http://www.cpsc.gov/mpeg.html (last visited July 30, 2004) (providing more than 140 VNRs regarding product safety recalls and related issues); Website of Transportation Security Administration, http://www.tsa.gov/public/display?theme=8&content=0900051980058a7d (last visited July 30, 2004) (providing VNRs on transportation security); Website of Food and Drug Administration, http://www.foodsafety.gov/~fsg/vlibrary.html (last visited July 30, 2004) (providing VNRs regarding issues related to food safety); Website of Selective Service System, http://www.sss.gov/News_Conferences/press-5-22-01.htm (last visited July 30, 2004) (providing VNR regarding increase in selective service registration after years of steady decline); Website of National Science Foundation, http://www.nsf.gov/od/lpa/news/press/01/lasik_video.htm (last visited July 30, 2004) (providing VNR about advances in Lasik eye surgery techniques resulting from agency-funded research programs); Website of Library of Congress, http://www.loc.gov/loc/lcib/00089/bi_press.html (last visited July 30, 2004) (noting that "[a] special video news release on the Library's April 24th celebration aired on more than 55 television stations across the nation").

[5] In this fiscal year, for example, members of Congress received appropriated funds through the Legislative Branch Appropriations Act, 2004, Pub. L. No. 108-83, 117 Stat. 1007 (2003), and those funds are subject to the "publicity or propaganda" prohibition contained in the Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, tit. VI, § 624, 118 Stat. at 356 ("No part of any appropriation contained in this *or any other Act* shall be used for publicity or propaganda purposes within the United States not heretofore authorized by the Congress.") (emphasis added).

These governmental VNRs have not been limited to slates and B-roll film— they have routinely included story packages that could be aired without further editing. The Agency for International Development, for example, issued a VNR story package in 2003 discussing its programs in Afghanistan that included the coda "this is Mary Lou Galyo reporting." *See* Website of Agency for International Development, http://www.usaid.gov/press/releases/2003/vnr030226.html (last visited July 30, 2004). The Centers for Disease Control broadcast a VNR story package in 2000 regarding the dangers of smoking that included an interview with the Surgeon General, did not identify the agency as the source, and ended with "this is Sarah Vetter reporting." *See* Website of Centers for Disease Control, http://www.cdc.gov/tobacco/sgr_tobacco_use_trailer.htm (last visited July 30, 2004). And HHS created two VNR story packages in 1999 setting forth the Clinton Administration's position on prescription drug benefits and preventive health. *See* GAO VNR Decision at 8, 2004 WL 1114403, at *5.[6]

The MMA, passed on December 8, 2003, makes several amendments to title XVIII of the Social Security Act, the Medicare federal health insurance program. *See generally* GAO March 2004 Decision at 3, 2004 WL 523435, at *2. In the text of the Act, Congress specifically requires HHS and CMS to "broadly disseminate information" regarding the MMA's prescription drug coverage, discount card program, and transitional assistance for low-income individuals. Pub. L. No. 108-173, § 101(a), 117 Stat. at 2075; *see also* GAO March 2004 Decision at 9, 2004 WL 523435, at *7. The Conference Report reiterates that HHS and CMS are to "conduct a significant public information campaign to educate beneficiaries about the new Medicare drug benefit," including a "concerted effort to . . . ensur[e] that the lower income seniors are aware of the additional benefits available to them." H.R. Conf. Rep. No. 108-391, at 432–33 (2003).

The three VNRs (two in English; one in Spanish) at issue here have been produced by HHS and CMS in conjunction with Ketchum Public Relations and Home Front Communications to provide information about certain Medicare benefits under the MMA. *See* Smith Letter, Encl. 1. A cover page accompanying the VNRs—entitled "Government Answers Questions about New Medicare Law"— identifies key facts about the MMA and includes a description of the available video news feed. *Id.*, Encl. 2. Each VNR contains B-roll film of President Bush signing the MMA in the presence of members of Congress, a senior citizen at a

---

[6] *See also*, *e.g.*, Website of Federal Trade Commission, http://www.ftc.gov/opa/2002/10/vnrma.htm (last visited July 30, 2004) (providing VNR story package discussing agency efforts to improve cyber-security in the private sector); Website of Census Bureau, http://www.census.gov/pubinfo/www/multimedia/adoption.html (last visited July 30, 2004) (providing VNR story package addressing adoption programs in Congress, including footage of Senators promoting those programs); Website of State Department, http://www.state.gov/r/pa/obs/vid/30246.htm (last visited July 30, 2004) (providing VNR story package addressing issues facing women abroad with narration and footage of the Secretary).

pharmacy, a pharmacist filling a prescription, senior citizens receiving blood pressure tests, and senior citizens enjoying various activities. *See* GAO VNR Decision at 6, 2004 WL 1114403, at *3. The Spanish version contains video statements regarding the changes to Medicare under the MMA by Dr. Christina Beato of CMS; the English versions contain similar video statements by Tommy Thompson, Secretary of HHS, and Leslie Norwalk, Acting Deputy Administrator and Chief Operating Officer of CMS. *Id.* at 6–7, 2004 WL 1114403, at *3–*4.

Each of the VNRs also includes a story package with a lead-in script that may be read by a news anchor. *Id.* The story packages are narrated by Alberto Garcia (Spanish) and Karen Ryan (English), and each story package ends with the narrator stating: "In Washington, I'm Alberto Garcia [or Karen Ryan] reporting." *Id.* at 7–8, 2004 WL 1114403, at *4–*5. Two of the story packages (one in English; one in Spanish) specifically address prescription drug benefits under the MMA and include statements such as "millions of people who are covered by Medicare [are] asking how [it] will help them" and "[the reporter] helps sort through the details." *Id.* at 7, 2004 WL 1114403, at *4. The interviews and narration of these story packages also indicate that the primary focus of the MMA is on the 2006 prescription drug benefit; that savings of up to twenty-five percent will be available with temporary discount cards in 2004; that preventive benefits will be offered; that low-income individuals may qualify for a $600 credit on certain drug discount cards; and that no Medicare recipient will be forced to sign up for any of the new benefits. *Id.* The other story package (only in English) specifically addresses CMS's advertising campaign and includes statements such as "the Federal Government is launching a new, nationwide campaign to educate 41 million people with Medicare about improvements to Medicare" and "the same Medicare you've always counted on plus more benefits . . . . [is] the main message Medicare's advertising campaign drives home about the new law." *Id.* at 6, 2004 WL 1114403, at *4. The narration of this story package also "indicat[es] that the campaign helps beneficiaries answer their questions about the new law, the administration is emphasizing that seniors can keep their Medicare the same, and the campaign is part of a larger effort to educate people with Medicare about the new law." *Id.* at 6–7, 2004 WL 1114403, at *4. "CMS [has] clearly identified itself as the source of these materials to the television stations receiving them," and the last slate informs the receiving news stations to contact CMS for information about the VNRs. *Id.* at 6, 12, 2004 WL 1114403, at *3, *8.

In response to a request from GAO regarding the production, filming, and distribution of the VNRs, HHS and CMS stated:

> [T]he VNR was not produced as a purported editorial, advocacy piece, or commentary. The purpose of this media effort was to convey factual information concerning changes to Medicare under the [MMA]. Karen Ryan, who narrates the English language VNR, does

not take any position whatsoever on the MMA. Instead, she merely reports what she specifically states are explanations of the new law by HHS and CMS officials. Secretary Thompson's and Acting Deputy Administrator Norwalk's statements about the MMA are directly attributed to them, in their official capacities. Ms. Ryan states further, and accurately, "Medicare officials emphasized that no one will be forced to sign up for any of the new benefits." She never states that this is her, or anyone else's, statement or view. Likewise, she adds, "The new law, say officials, simply offers people with Medicare ways to make their health care coverage more affordable." Again, it is made clear to the viewer that this is a statement from Medicare officials, rather than a party outside the agency. Similarly, in the Spanish language VNR, reporter Alberto Garcia interviews an identified Administration official about that official's statements regarding MMA. The narrator's statements are not editorials and do not advocate a position, and the officials' statements are not attributed to anyone outside Government.

Smith Letter, Encl. 1.

On May 19, 2004, GAO issued an opinion concluding that the VNR story packages violate the prohibition in the CAR on the use of appropriated funds for "publicity or propaganda" because they do not identify "HHS or CMS as the source to the targeted television audience, and the content of the news reports was attributed to individuals purporting to be reporters, but actually hired by an HHS subcontractor." GAO VNR Decision at 16, 2004 WL 1114403, at *11. That decision marks the "first occasion" GAO has had to examine VNRs for consistency with the "publicity or propaganda" prohibition. *Id.* at 9, 2004 WL 1114403, at *6. GAO noted that it had historically interpreted such riders to preclude funding for agency materials that were (i) self-aggrandizing, (ii) purely partisan in nature, or (iii) covert propaganda. *Id.* at 10, 2004 WL 1114403, at *7. It determined that the VNRs only implicated the third prohibition. *Id.* In reviewing the VNRs for "covert propaganda," GAO refused to place any significance upon the fact "that the use of VNR materials, with already prepared story packages, is a common practice in the public relations industry and utilized . . . by government entities." *Id.* at 9–10, 2004 WL 1114403, at *6. It also discounted Congress's statutory requirement that HHS and CMS "broadly disseminate information" regarding the MMA, concluding that "[w]hile CMS may have authority to use appropriated funds to disseminate information regarding the changes to Medicare pursuant to MMA, this authority is subject to the publicity or propaganda prohibition appearing in the annual appropriation act." *Id.* at 10, 2004 WL 1114403, at *7.

GAO stated that, in its prior decisions, "findings of propaganda [we]re predicated upon the fact that the target audience could not ascertain the information

source." GAO VNR Decision at 11, 2004 WL 1114403, at *7. It cited a 1986 GAO decision in which "government-prepared editorials" supporting "President Reagan's proposal to transfer the Small Business Administration [("SBA")] to the Department of Commerce" were deemed "covert propaganda" because they did not "disclos[e] to the readers of those editorials that SBA was the source of the information." *Id.* (discussing Letter for Lowell Weicker, Jr., Chairman, Committee on Small Business, U.S. Senate, B-223098, B-223098.2, 1986 WL 64325 (Comp. Gen. Oct. 10, 1986) ("GAO SBA Decision")). It also cited a 1987 decision in which GAO determined that a program in which the State Department's Office of Public Diplomacy for Latin America paid consultants "to write op-ed pieces in support of the Administration's policy on Central America for distribution to newspapers" was "covert propaganda" because "[t]hese materials were 'propaganda' within the 'common understanding' of the term . . . designed to influence the media and public to support the Administration's Latin American policies." *Id.*, 2004 WL 1114403, at *8 (discussing *To the Honorable Jack Brooks*, 66 Comp. Gen. 707 (Sept. 30, 1987) ("GAO State Department Decision")). In the GAO SBA Decision, the newspapers, but not the readers, were made aware of SBA's involvement; in the GAO State Department Decision, neither the newspapers nor the readers were made aware of the State Department's involvement.

Based upon its reading of those decisions, GAO determined that the VNR story packages—but not the slates or the B-roll film—constitute "covert propaganda." GAO VNR Decision at 16, 2004 WL 1114403, at *11. GAO separated out the slates and the B-roll film on the basis that they are intended for use by the television stations themselves, which are made aware of the role of HHS and CMS. *Id.* at 12, 2004 WL 1114403, at *8. But because the story packages are intended for the television viewing audience, and because the story packages do not make the television audience aware of the role of HHS and CMS, GAO determined that the story packages constitute "covert propaganda." *id.* "Importantly," GAO explained, "CMS included no statement or other reference in either the story package or the anchor lead-in script to ensure that the viewing audience would be aware that CMS [wa]s the source of the purported news story." *Id.* That failure to identify the source was dispositive, GAO concluded: "While we agree that the story packages may not be characterized as editorials, explicit advocacy is not necessary to find a violation of the prohibition." *Id.* at 14, 2004 WL 1114403, at *10. Although GAO stated in a footnote that "[o]n balance, the contents of the story packages consist of a favorable report on effects on Medicare beneficiaries, containing the same notable omissions and weaknesses as the [HHS and CMS] flyer and advertisements that we reviewed in our March 2004 opinion," *id.* at 14 n.34, 2004 WL 1114403, at *11-*12 n.34, it made clear that "the content of the story packages themselves would not violate the publicity or propaganda prohibition if identifying the source to the target audience were not at issue," *id.* at 14,

2004 WL 1114403, at *10.[7] GAO therefore concluded that HHS and CMS have violated the "publicity or propaganda" prohibition in the CAR and, for that reason, also have violated the Anti-Deficiency Act, 31 U.S.C. § 1341 (2000), which prohibits making or authorizing an expenditure that exceeds available budget authority. GAO VNR Decision at 16, 2004 WL 1114403, at *11.

You have asked us to review GAO's VNR Decision and to provide our opinion on whether the expenditure of appropriated funds for production and distribution of the VNRs in question violates the "propaganda" prohibition in the CAR. For purposes of this memorandum, we take as a given that the VNRs produced by HHS and CMS are purely informational in content. As noted above, HHS and CMS maintained to GAO that the VNRs are "factual and accurate" and intended to "help TV stations and their audiences understand the basic provisions of the new Medicare law." Smith Letter at 2. GAO also stated that it "agree[d] that the story packages may not be characterized as editorials" and that "the content of the story packages themselves would not violate the publicity or propaganda prohibition if identifying the source to the target audience were not at issue." GAO VNR Decision at 14 & n.34, 2004 WL 1114403, at *10 & n.34. The VNRs communicate information to the public about the new prescription drug benefits added by the MMA to the Medicare program administered by CMS. The VNRs are designed to assist in fulfilling Congress's statutory mandate that HHS and CMS "broadly disseminate information" about the new Medicare benefits to the forty-one million potential beneficiaries. Pub. L. No. 108-173, § 101(c)(1), 117 Stat. at 2075. We understand that VNR story packages—as their widespread use by public and private entities attests—are highly effective at disseminating information: By providing video and audio in a pre-packaged and easily accessible format, VNR story packages significantly increase the likelihood that news programs will broadcast at least part of the provided information. CMS and HHS accordingly have chosen to use such story packages as part of their larger effort, pursuant to the requirements of the MMA, to inform the public of the significant changes

---

[7] In the referenced March 2004 decision, GAO concluded that the content of certain HHS and CMS advertisements regarding the MMA did not constitute a "purely partisan message" for purposes of the "publicity or propaganda" prohibition:

> The flyer and advertisements do not provide beneficiaries with comprehensive information about the benefits available as a result of MMA, or comparative details about those benefits. In addition, they do not address the impact of MMA on those eligible for both Medicaid and Medicare and those with Medicare supplemental policies. They do, however, identify the new benefits, note when they will become available, and . . . provide some information describing the new benefits. Notably, the materials refer beneficiaries to other sources for further information . . . .

GAO March 2004 Decision at 10, 2004 WL 523435, at *8. The "favorable" nature of the VNRs would seem to be a function of their exclusive focus on the new prescription drug benefits available to seniors; and any "notable omissions and weaknesses"—as GAO acknowledged, *see* GAO VNR Decision at 14 & n.34, 2004 WL 1114403, at *10 & n.34—seem to be a product of the VNRs' necessarily limited scope.

wrought to Medicare benefits by the MMA. Although it is true that facts can be presented in a biased or selective manner in order to advocate a particular view, the VNRs in question do not editorialize about proposed legislation or otherwise advocate a position on a question of public policy. HHS and CMS, through the VNRs, are simply reporting about the new Medicare benefits provided under the duly-enacted MMA. With that understanding, and for the reasons discussed below, we conclude that the expenditure by HHS and CMS of appropriated funds for the production and distribution of the VNRs does not violate the CAR's prohibition on "propaganda."

## II.

We have not heretofore "set out a detailed, independent analysis of 'publicity or propaganda' riders." Memorandum for the Attorney General from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Anti-Lobbying Act Guidelines* at 3 (Apr. 14, 1995). However, based upon the analysis set forth below, including a review of the text and history of those riders, as well as GAO's own earlier decisions interpreting them, we conclude, consistent with those earlier decisions, that the prohibition on "covert propaganda" applies to the advocacy of a particular viewpoint, not to the legitimate provision of information concerning the existing programs administered by the agency. We therefore determine—in light of the fact recognized by GAO that "the content of the story packages" at issue here is not editorial in nature, GAO VNR Decision at 14, 2004 WL 1114403, at *10—that the VNRs do not constitute "covert propaganda."

Although GAO is part of the Legislative Branch, *see Bowsher v. Synar*, 478 U.S. 714, 727–32 (1986), and we are therefore not bound by its legal opinions, *see General Services Administration Use of Government Funds for Advertising*, 25 Op. O.L.C. 91, 94 & n.5 (2001) ("*GSA Advertising*"), we have historically found GAO's decisions in this area helpful, *see*, *e.g.*, *Establishment of the President's Council for International Youth Exchange*, 6 Op. O.L.C. 541, 547–48 (1982). GAO has interpreted the "publicity or propaganda" riders to prohibit three types of agency publications: those that are (i) self-aggrandizing, (ii) purely partisan in nature, or (iii) covert propaganda. GAO VNR Decision at 10, 2004 WL 1114403, at *7.

The "self-aggrandizing" interpretation stems from GAO's cardinal decision addressing the "publicity or propaganda" restrictions, which were first enacted in 1951. *See Appropriations—Limitations—Publicity and Propaganda Prohibition—Labor-Federal Security Appropriation Act, 1952*, 31 Comp. Gen. 311 (1952) ("GAO 1952 Decision"). GAO determined that the intent of the riders was "to prevent publicity of a nature tending to emphasize the importance of the agency or activity in question," *id.* at 313, and it has since considered such gratuitous self-aggrandizement or puffery to be unauthorized "publicity," GAO March 2004

Decision, *supra* note 2, at 7-8, 2004 WL 523435, at *6. The "purely partisan in nature" interpretation, which may be traced to a 1960 GAO decision, posits that a publication may be so political in nature that it is not in furtherance of the purposes for which Government funds were appropriated. *See id.* at 8, 2004 WL 523435, at *7 (discussing Letter for Joseph S. Clark, United States Senate, B-144323 (Comp. Gen. Nov. 4, 1960), *available at* http://www.gao.gov/legal/index.html (last visited June 3, 2013)). GAO thus considers publications that are "completely devoid of any connection with official functions" or "completely 'political in nature'" to be barred as "propaganda" under the appropriations riders. *Id.* (quoting Letter for William L. Dawson, Chairman, Committee on Government Operations, House of Representatives, B-147578 (Comp. Gen. Nov. 8, 1962) ("GAO 1962 Letter"), *available at* http://www.gao.gov/legal/index.html (last visited June 3, 2013)). We have recognized the categories of "self-aggrandizing" and "purely partisan in nature" as reasonable and valid interpretations of the "publicity or propaganda" riders, *GSA Advertising* at 94–95 & n.6, and we agree with GAO that neither of those categories is implicated by the VNRs at issue here, *see* GAO VNR Decision at 10, 2004 WL 1114403, at *7.[8]

That leaves the "covert propaganda" interpretation, which appears to stem from a 1978 decision in which GAO determined that a similarly worded appropriations rider—which prohibited the expenditure of funds on "publicity or propaganda . . . designed to support or defeat legislation pending before Congress"—prevented the Office of Consumer Affairs ("OCA") from preparing "canned editorial materials" designed to make "public support for a particular point of view . . . appear greater than it actually is." Letter for John M. Ashbrook, U.S. House of Represeratives, B-129874, at 3, 9, 1978 WL 10700, *3, *7 (Comp. Gen. Sept. 11, 1978) ("GAO OCA Decision"). As noted above, GAO applied this interpretation in its 1986 SBA Decision and its 1987 State Department Decision. In the latter, addressing an appropriations prohibition materially identical to the one at issue here, GAO explained that publications that were "misleading as to their origin and reasonably constituted 'propaganda' within the common understanding of that term" were forbidden "covert propaganda." GAO State Department Decision, 66 Comp Gen. at 709. This Office has previously recognized the "covert propaganda" interpretation in terms similar to those articulated by GAO in its State Department Decision; we have stated that "covert attempts to *mold opinion* through the undisclosed use

---

[8] The prohibition in the CAR refers, in the disjunctive, to "publicity" or "propaganda." Pub. L. No. 108-7, § 626, 117 Stat. at 470. GAO has interpreted the term "publicity" to prohibit gratuitous "self-aggrandizement," GAO 1952 Decision, 31 Comp. Gen. at 313 (riders "prevent *publicity* of a nature tending to emphasize the importance of the agency or activity in question") (emphasis added), and the term "propaganda" to prohibit "purely partisan" activity, GAO March 2004 Decision at 8, 2004 WL 523435, at *7 (riders prevent "general *propaganda* effort[s] designed to aid a political party or candidates") (quoting GAO 1962 Letter) (emphasis added; internal quotation marks and citation omitted), as well as "covert propaganda." Because only the "covert propaganda" interpretation is at issue here, we focus in this memorandum on the term "propaganda."

of third parties" can constitute an illegal use of funds. *Legal Constraints on Lobbying Efforts in Support of Contra Aid and Ratification of the INF Treaty*, 12 Op. O.L.C. 30, 40 (1988) (emphasis added). In addressing the VNRs at issue here, we adhere to that understanding of the "covert propaganda" prohibition. We believe, however, that the articulation now adopted by GAO in its VNR Decision does not represent a reasonable application of that prohibition or a fair interpretation of the CAR.

In all previous instances in which GAO has found "covert propaganda," the publications at issue were both (i) "misleading as to their origin" (i.e., "covert") *and* (ii) "constituted 'propaganda' within the common understanding of that term." GAO State Department Decision, 66 Comp. Gen. at 709; *see also* GAO SBA Decision at 9, 1986 WL 64325, at *6 (publications deemed "misleading as to their origin and reasonably constitute[d] 'propaganda' within the common understanding of that term"); *cf.* GAO OCA Decision at 9, 1978 WL 10700, at *7 ("canned editorial material and sample letter to the editor" were similar to "high-powered lobbying campaigns in which public support for a particular view is made to appear greater than it actually is"). In its VNR Decision, however, GAO dispensed with the "propaganda" requirement and focused solely on the "covert" nature of the communication. That interpretation, in our view, is improperly removed from the plain text of the CAR appropriations rider, which in relevant part proscribes "propaganda."

"'Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'" *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004) (quoting *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985)). The dictionary definition of "propaganda" is "[t]he systematic dissemination of doctrine, rumor, or selected information *to promote or injure a particular doctrine, view, or cause*." *Black's Law Dictionary* 1232 (7th ed. 1999) (emphasis added); *see also* 12 *Oxford English Dictionary* 632 (2d ed. 1989) (defining "propaganda" to mean "[t]he systematic propagation of information or ideas by an interested party, esp. in a tendentious way *in order to encourage or instill a particular attitude or response*") (emphasis added); *Webster's Third New International Dictionary* 1817 (2002) (defining "propaganda" to mean "dissemination of ideas, information, or rumor *for the purpose of helping or injuring* an institution, a cause, or a person" or "doctrines, ideas, arguments, facts, or allegations spread by deliberate effort through any medium of communication *in order to further one's cause or to damage an opposing cause*") (emphasis added). As commonly understood, to propagandize is not simply to provide information—it is to advocate, disseminate, and encourage a particular view, doctrine, or cause.

That was also evidently the understanding in 1951, when Congress first included restrictions on the use of funds for "publicity or propaganda" in appropriations

statutes. *See, e.g.*, Labor-Federal Security Appropriation Act, 1952, Pub. L. No. 82-134, 65 Stat. 209 (1951).[9] The contemporaneous dictionary definitions of "propaganda"—like the modern definitions noted above—indicated a systematic effort at indoctrination to a particular viewpoint, as opposed to a mere promulgation of information. *See, e.g., Funk & Wagnalls New Standard Dictionary of the English Language* 1985 (1946) (defining "propaganda" as "[e]ffort directed systematically toward the *gaining of support for an opinion or course of action*" or "any institution or *systematic scheme for propagating a doctrine or system*") (emphasis added); *Webster's New International Dictionary* 1983 (2d ed. 1958) (defining "propaganda" as "[a]ny organized or concerted group, effort, or movement *to spread a particular doctrine or system of doctrines or principles*," "dissemination of ideas, information, or gossip, or the like, *for the purpose of helping or injuring a person, an institution, a cause, etc.*," or "a scheme or plan for *the propagation of a doctrine or a system of principles*") (emphasis added). Consistent with those definitions, the legislative history of the original enactment of the "publicity or propaganda" prohibitions indicates that Congress intended to eradicate (i) agency efforts to direct and control public thinking on various issues of public debate, particularly through overt political action;[10] (ii) useless, excessive, or frivolous agency publications;[11] and (iii) agency self-promotion, aggran-

---

[9] There was no legislative discussion regarding the "publicity or propaganda" prohibition in the CAR at issue here. Although Congress has routinely included restrictions on "publicity or propaganda" in appropriations acts for the past fifty years, the legislative record has been largely silent since their original enactment in 1951 and 1952. *See, e.g.*, GAO State Department Decision, 66 Comp. Gen. at 709 ("The legislative history of [the current version] is silent as to the intended effect of the restriction."); GAO SBA Decision at 8, 1986 WL 64325, at *6 (same); *cf.* GAO March 2004 Decision at 6, 2004 WL 523435, at *5 (consulting the legislative history of the 1951 version to interpret the current version of the prohibition).

[10] *See, e.g.*, 97 Cong. Rec. 4099 (1951) (statement of Rep. Meader) ("It is wrong to have the executive branch of the Government spending the taxpayers' funds to influence public thinking and to create policy."); *id.* at 4741 (statement of Rep. Smith) ("I wonder why the Government is engaged in the business of directing public thinking. This amendment is merely an effort to stop that practice."); *id.* at 4742 (statement of Rep. Vursell) (arguing that the amendment will "restrict propaganda, thought control, and unnecessary expense of publicity"); *id.* at 347–48 (statement of Sen. Watkins) (introducing into the record an article from *Forbes Magazine* and *Reader's Digest* entitled "What Taxpayers Pay for Federal Thought Control," which criticized the use of taxpayer funds by the Social Security Administration to promote "socialized medicine" and by the Department of Agriculture to organize a rally in favor of the Administration's farm program); *id.* at 4099 (statement of Rep. Bow) (objecting to efforts by the Federal Security Agency to "organize local groups and then get those local groups to put the heat on the Congress" regarding "socialized medicine"); *id.* at 5474 (statement of Rep. Davis) (referring to the "disgraceful experience" of bringing county farm representatives to Minneapolis at taxpayer expense "to form a captive audience to let the Secretary of Agriculture expound his own personal straitjacket political farm plan" in hopes that "those people would go to their respective home communities as disciples for that kind of a regimentation plan").

[11] *See, e.g.*, 97 Cong. Rec. 5475 (statement of Rep. Meader) (describing federal pamphlets produced by taxpayer funds about vagrant cats, mist netting of Japanese birds, and eating fish for breakfast); *id.* at 6735 (statement of Sen. Byrd) (criticizing "useless[]" agency mailers such as "Raccoons of North and Middle America" and "Can Elephants and Water Buffalos Outwork Machinery?").

dizement, or puffery.[12] The overarching concern was the use of federal funds to manipulate and control public opinion about policy issues: "[P]ublic opinion ought not . . . be subjected to influence and direction by the executive agencies, the administrative branch of the government, in the manner that it is today. . . . The people should not finance use of these agencies to foster and perpetuate the bureaucrats [*sic*] not the people's objectives in national policy." 97 Cong. Rec. 4099 (statement of Rep. Meader); *see also id.* at 6733–34 (statement of Sen. Byrd) (calling propaganda from the federal bureaucracy "one of the greatest abuses in our [time]" and suggesting that riders would "result in more news and less 'bull' from the Federal publicity mill").

Just as clearly as Congress sought to stamp out government dissemination of political, frivolous, and self-aggrandizing publications, Congress sought to protect government dissemination of "legitimate informational work" or "facts about the work of the[] departments to the public." 97 Cong. Rec. 6734, 6735 (statements of Sens. Aiken and Byrd). The chief objection to the appropriations riders was that they did not define the phrase "publicity or propaganda" with any precision, and thereby threatened public access to legitimate and necessary information.[13] Representative Yates questioned whether the amendments would "jeopardize publication by the Children's Bureau of pamphlets pertaining to the training and growth of children," *id.* at 4098; Senator Anderson objected to the amendments on the ground that they might block the production of a film "by the Atomic Energy Commission in order that school children may have an opportunity to become acquainted with some of the very important facts in connection with atomic activity," *id.* at 6798. The sponsors—Representative Smith in the House and Senator Byrd in the Senate—responded that they intended to invoke the ordinary understanding of the term "propaganda," which they believed was sufficiently limpid to distinguish true propaganda from legitimate information. Representative Smith explained, "It seems to me that we can well distinguish between what is propaganda and what is educational matter." *Id.* at 4098. Senator Byrd "recog-

---

[12] *See, e.g.*, 97 Cong. Rec. 6734 (statement of Sen. Byrd) ("Individual glorification of bureaucrats and political propaganda constitute the press service problem which this amendment seeks to curtail."); 98 Cong. Rec. 2304 (1952) (statement of Rep. Meader) (complaining about the continued use of appropriated funds by federal agencies to engage in self-promotion, such as the dissemination of a "15-minute [radio] transcript that you can use to promote the philosophy and interests of the National Production Authority").

[13] *See, e.g.*, 97 Cong. Rec. 4099–4100 (statement of Rep. Fogarty) ("We do not even know what the gentleman calls propaganda. We do not know what he calls the right type of publicity or the wrong type of publicity. That is the fault I find with this amendment. . . . [Y]ou do not define in the amendment what propaganda is or what publicity is."); *id.* at 6798–99 (statement of Sen. Anderson) (arguing that Department of Agriculture information specialists are not propagandists and serve an important function of disseminating information to farmers); *id.* at 6798 (statement of Sen. Benton) (objecting on the grounds that the term "publicity" is loosely defined and the amendment did not distinguish between forbidden publicity and "the general activities of the Department [of Agriculture] in the field of education and instruction").

nize[d] the need for disseminating information" and maintained that the amendments "would not in any way affect the legitimate efforts of agencies in disseminating information and answering requests from Members of Congress and the public generally." *Id.* at 6796. In addition, informational programs otherwise authorized by statute did not fall within the scope of the amendments, which extended "only to matters which have not had the support or the approval of . . . Congress." *Id.* at 4098 (statement of Rep. Phillips). The legislative history of the original appropriations riders thus suggests that Congress understood and embraced the distinction between true "propaganda" and legitimate "information" about government programs, and did not intend for the appropriations riders to restrict the latter.

Prior GAO and OLC opinions in this area further support this understanding. The "covert propaganda" interpretation may be traced, as noted above, to a 1978 GAO decision regarding efforts by the OCA to "engage in [a] political controversy as a *proponent of* proposed legislation that would establish a Consumer Protection Agency." GAO OCA Decision at 6, 1978 WL 10700, at \*4 (emphasis added). GAO stated that "[i]n interpreting 'publicity or propaganda' provisions . . . this Office has consistently recognized that every Federal agency has a legitimate interest in communicating with the public and with the Congress regarding its policies and activities." *Id.* at 3–4, 1978 WL 10700, at \*3.[14] GAO condemned, however, OCA's preparation of "canned editorial materials and sample letters to the editor," explaining that "canned and sample propaganda materials have been traditionally associated with *high-powered lobbying campaigns* in which public support for *a particular point of view* is made to appear greater than it actually is." *Id.* at 9, 1978 WL 10700, at \*7 (emphasis added). Similar reasoning was articulated in GAO's 1986 opinion regarding SBA efforts to "put[] forth the Administration's *position* regarding the proposed reorganization of SBA." GAO SBA Decision at 4, 1986 WL 64325, at \*3 (emphasis added). Although GAO reiterated its longstanding view that the appropriations riders "do not prohibit an agency's legitimate informational activities," it determined that SBA-prepared "editorials" on the proposed reorganization were improper because they were "misleading as to their origin *and* reasonably constitute[d] 'propaganda' within the common understanding of that term." *Id.* at 9, 1986 WL 64325, at \*6 (emphasis added); *see also id.* ("[W]e conclude that the SBA 'suggested editorials' are beyond the range of acceptable agency public information activities[.]"). GAO adhered to that understanding in its 1987 opinion involving "articles, editorials, and op-ed pieces" produced by the State Department's Office of Public Diplomacy for Latin America "*in support of the Administration's position*" favoring the Contra forces in

---

[14] Indeed, in its first opinion addressing the "publicity or propaganda" riders, GAO stated that "[i]t appears clear . . . that the prohibition . . . would not be for application to those functions . . . which deal with dissemination to the general public, or to particular inquirers, of information reasonably necessary to the proper administration of the laws." GAO 1952 Decision, 31 Comp. Gen. at 314.

Nicaragua. GAO State Department Decision, 66 Comp. Gen. at 708 (emphasis added). GAO concluded that the State Department publications "were misleading as to their origin *and* reasonably constituted 'propaganda' within the common understanding of that term." *Id.* at 709 (emphasis added). The essential factors in the prior GAO opinions were (i) that the agency's role in the publication was not disclosed *and* (ii) that the content of the information published was "propaganda" as that term is ordinarily understood.

This Office, too, has previously noted that "[t]he role of the federal government in providing 'information' has traditionally been recognized as proper," Memorandum for Robert J. Lipshutz, Counsel to the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Statutory Restraints on Lobbying Activity By Federal Officials* at 7 (Nov. 29, 1977) ("*Lobbying Activity*"),[15] and has read the "covert propaganda" prohibition to target only "covert attempts to *mold opinion* through undisclosed use of third parties," 12 Op. O.L.C. at 40 (emphasis added). That understanding—faithful to the language in the CAR—also comports with our recognition that the appropriations riders, if construed broadly, would bring a halt to a number of activities in which Executive officials have historically engaged, and would thus raise constitutional concerns. *See* Memorandum for John R. Bolton, Assistant Attorney General, Office of Legislative Affairs, from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel, *Re: Applicability of 18 U.S.C. 1913 to Contacts Between United States Attorneys and Members of Congress in Support of Pending Legislation* at 1 & n.3 (Oct. 27, 1987). We have accordingly determined that "the appropriation rider should be read as principally designed to meet the immediate evil perceived by Congress—the unchecked growth of a government public relations arm used to disseminate agency [views] to the public at large—not as an effort to interfere unduly with the normal and healthy functioning of the body politic." *Lobbying Activity* at 6.[16]

We therefore do not agree with GAO that the "covert propaganda" prohibition applies simply because an agency's role in producing and disseminating infor-

---

[15] Although the *Lobbying Activity* memorandum addressed an appropriations rider that prohibited expenditures "for publicity or propaganda purposes designed to support or defeat legislation pending before Congress," that similarly worded provision also has been interpreted by GAO to allow the dissemination of legitimate informational material. *See GAO OCA Decision* at 3–4, 1978 WL 10700, at *3 ("In interpreting 'publicity or propaganda' provisions such as section 607(a), this Office has consistently recognized that every Federal agency has a legitimate interest in communicating with the public and with the Congress regarding its policies and activities.").

[16] There is little judicial case law addressing the various "publicity or propaganda" appropriations riders, but what there is supports our textual reading. *See Dist. of Columbia Common Cause v. Dist. of Columbia*, 858 F.2d 1, 11 (D.C. Cir. 1988) ("Printing pamphlets, flyers, and posters in connection with an initiative campaign constitutes publicity or propaganda within the meaning of the appropriations statute.") (emphasis added); *Nat'l Treas. Emps.' Union v. Campbell*, 654 F.2d 784, 794 (D.C. Cir. 1981) ("The evident purpose of the anti-'propaganda' limitations is to curtail bureaucratic aggrandizement at the taxpayers' expense.") (emphasis added).

mation is undisclosed or "covert," regardless of whether the content of the message is "propaganda." GAO VNR Decision at 14, 2004 WL 1114403, at *10.[17] Congress evidently intended for the appropriations riders to prevent agency advocacy of particular opinions or views; the term "propaganda" cannot fairly be read to encompass agency promulgation of legitimate governmental information about the programs administered by an agency and in furtherance of that agency's statutory goals. We are sensitive to GAO's concern about "agencies creating news reports unbeknownst to the receiving audience." *Id.* at 13, 2004 WL 1114403, at *9. But we believe a line must be drawn to distinguish legitimate governmental information from improper governmental advocacy.[18] The VNRs at issue here did not advocate a particular policy or position of HHS and CMS, but rather provided accurate (even if not comprehensive) information about the benefits provided under a recent Act of Congress: the MMA.[19] Informing the public of the facts about a federal program is not the type of evil with which Congress was concerned in enacting the "publicity or propaganda" riders.

Not only do members of Congress themselves use VNRs, as already noted, but Congress also has long been aware of the use of VNRs by federal agencies, which rely upon VNRs as highly effective and efficient tools for disseminating information. *See, e.g.*, S. Rep. No. 106-229, vol. II, at 517 (2000) ("[Food and Drug Administration] launched a public awareness campaign on the risk that unpasteurized or untreated juices may present to vulnerable populations, including the elderly. Educational materials including a press kit, consumer brochure, video news release, and a public service announcement were distributed to senior citizen groups, as well as day care centers, elementary schools, state PTA offices and media outlets. AARP and other organizations also assisted in distribution of the information."); *id.* at 1320 ("The [United States Postal] Inspection Service will

---

[17] The two statutory provisions GAO cited in support of its conclusion are inapposite. *See* GAO VNR Decision at 13, 2004 WL 1114403, at *9 (citing 22 U.S.C. § 1461 and 47 U.S.C. § 396(g)(3)(A)&(B)). The first, 22 U.S.C. § 1461 (2000 & Supp. III 2004), prevents the Board of Broadcasting Governors from broadcasting pro-American news reports to domestic audiences. Such programs, however, would appear to constitute "propaganda" as commonly understood. The second, 47 U.S.C. § 396(g)(3)(A)&(B) (2000), prevents the Corporation for Public Broadcasting from producing or disseminating programs to the public. By its terms, however, that provision applies only to the Corporation for Public Broadcasting, which is not "an agency or establishment of the United States Government." 47 U.S.C. § 396(b).

[18] We have no occasion to determine the threshold of "propaganda" necessary to violate the appropriations riders where agency involvement is undisclosed, and it might well be lower than where agency involvement is acknowledged. We do not believe, however, that the "covert propaganda" prohibition may be invoked without *any* finding of "propaganda."

[19] Because we conclude that the VNRs do not constitute "covert propaganda," we need not determine whether Congress's instruction that HHS and CMS "broadly disseminate information" about the MMA, by itself, renders the CAR rider inapplicable. Pub. L. No. 108-7, § 626, 117 Stat. at 470 (banning publicity and propaganda "not heretofore authorized by the Congress"). We note that GAO, in its March 2004 Decision, stated that because of the "explicit authority" of HHS and CMS "to inform Medicare beneficiaries about changes to Medicare resulting from MMA," the agencies' "justification[s] for the materials [were] afforded considerable deference." *Id.* at 2–3, 2004 WL 523435, at *2.

issue three Video News Releases (VNRs) entitled, Conning Older Americans; How They Scam Older Americans; and Fraud Fighters which will be sent to local television stations via satellite for release during Consumer Protection Week. The VNRs correspond with the purpose of National Consumer Protection Week, which is to highlight consumer protection and education efforts around the country."); S. Rep. No. 105-36, vol. II, at 436–37 (1997) ("'How to Take the Scare Out of Auto Repair' is the print component of a multi-media education campaign conducted by the [Federal Trade] Commission in conjunction with [National Association of Attorneys General] and the American Automobile Association . . . . This campaign also included the production and distribution of a video news release by satellite to television stations, and radio public service announcements to 425 radio stations nationwide.").

Indeed, Congress has expressly approved the use of VNRs that, under GAO's VNR Decision, might now be considered "covert propaganda." In 1994, the Senate Committee on Appropriations supported the use of VNRs by the National Highway Traffic Safety Administration ("NHTSA"): "In fiscal year 1994, NHTSA used funding provided by the Committee for the development of video news release and radio public service announcements . . . informing the car-buying public as to how to purchase a new vehicle with attention to safety. . . . The Committee continues to be supportive of these efforts and believes that enhanced funding in fiscal year 1995 will better enable the agency to reach all segments of the car-buying public[.]" S. Rep. No. 103-310, at 136 (1994); *see also* 138 Cong. Rec. 1692 (1992) (statement of Rep. Slaughter) (introducing legislation that would "provide for the wide dissemination of . . . critical information [about diethylstil-bestrol] by authorizing an appropriation . . . to fund such activities as the production and distribution of . . . video news releases"). Given the widespread and accepted use of informational VNRs, we cannot conclude—without clearer instruction from Congress—that informational government VNRs constitute "covert propaganda."

STEVEN G. BRADBURY
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*
